14 N.J. Super. 420 (1951)
82 A.2d 210
JOHN REILLY, PLAINTIFF-RESPONDENT,
v.
180 CLUB, INC., A CORPORATION, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 11, 1951.
Decided July 6, 1951.
*421 Before Judges McGEEHAN, JAYNE, and WM. J. BRENNAN, JR.
Mr. Thomas L. Morrissey argued the cause for appellant (Messrs. Carpenter, Gilmour & Dwyer, attorneys; Mr. Patrick A. Dwyer and Mr. James P. Beggans, of counsel and on the brief).
Mr. Abraham J. Slurzberg argued the cause for respondent (Mr. Maurice M. Krivit, attorney).
The opinion of the court was delivered by JAYNE, J.A.D.
The transcript of the testimony in this case portrays an unfortunate episode in the life of Reilly.
While the narrative of the interrelated events may be summarized, yet in the interest of precision it is expedient to quote verbatim et literatim rather liberally from the testimony.
On the evening of Memorial Day in the year 1949 the plaintiff John Reilly resolved to visit a nearby tavern known as the "180 Club" on Wilkinson Avenue in the City of Jersey City. Among its accommodations it contained a semicircular bar which we are informed is not by reason of its spherical form productive of any special hazards in its appropriate use. Wooden stools were advantageously stationed around its contour for the comfort of the patrons.
*422 While the safe use of a stool probably depends particularly upon the capacity of the occupant to respond with alacrity to the deviations of equilibrium, yet our attention has not been invited to any authority holding that stools in a barroom are per se dangerous instrumentalities.
Upon entering at about 10:30 P.M. Reilly recognized among those present his acquaintances Messrs. Moriarity, McGee, and McKitrick in front of the bar with McDermott officiating behind it. Reilly forthwith mounted a vacant stool at the bar, "wrapped his feet around the rungs," and began to achieve the object of his visit. Presently Gillespie, O'Neill, and Gilligan dropped in.
The contingency which immediately attracted attention was that Moriarity was "needling" McGee with unprecedented continuity and persistence. Moriarity's inaugural comments ungraciously pertained to McGee's necktie, then to the latter's "sharp pants," then followed a dissertation concerning McGee's parsimony in which Moriarity proclaimed that "McGee was too cheap to buy a drink and he never did buy a drink and he wouldn't buy a drink for his own brother."
Gilligan supplied the following description of the march of affairs: "It would go on and on. Then it would seem Moriarity would get friendly with McGee; you would think everything was settled and, bingo, he would get sore at him again, and start, `Ah, you never were any good.' McGee told me, `I can only take so much.'"
And so Moriarity's "needling," McGee's exasperation, and the chosen beverages all continued to flow until about 1:30 A.M. when Moriarity uttered the remark that McGee had married a "Polack." Physical combat between the two immediately ensued, each made "one swipe" at the other, went into a clinch and while thus struggling, they collided with Reilly, capsizing both him and the stool with which he had been theretofore peacefully and placidly intertwined.
Those who observed the affray experienced some embarrassment at the trial by reason of the following sequence. Reilly sustained a fractured leg, and an ambulance was summoned, *423 which emergency gave rise to the apprehension that the police might initiate an investigation. McDermott, the bartender, profoundly interested in avoiding any impairment of the reputation of the tavern, induced the others to explain, if officially interrogated, that no strife had occurred, but that Reilly had fallen off the stool. When subsequently summoned to testify at the trial of the present action, they were confronted with their fables. It suffices to state that we are not requested to evaluate the weight and credibility of the evidence.
Reilly has a judgment against the defendant for $7,500 damages. We are only required by the present appeal to review the propriety of the action of the trial judge in refusing at the conclusion of the entire case to direct the entry of a judgment in favor of the defendant. Parrette v. Citizens Casualty Co. of N.Y., 5 N.J. Super. 258 (App. Div. 1949), certif. denied, 3 N.J. 502 (1950).
The reasons asserted for a reversal of the judgment are: (a) "there was no proof adduced by plaintiff that defendant (through its agent in charge) ought reasonably to have anticipated the occurrence," and (b) "plaintiff was chargeable with contributory negligence or assumption of risk as a matter of law."
The plaintiff prosecuted his cause of action in pursuance of the allegation that the defendant's servant who was present and in charge of the premises throughout the period to which reference has been made, was negligent.
Negligence as a basis of civil liability was unknown to medieval law. 8 Holdsworth, History of English Law, 449. It emerged from the legal soil as a variant of trespass and was accorded the form of action known as trespass on the case. The word "negligence" is one of broad significance, and in the popular sense it connotes the failure to exercise reasonable care. Actionable negligence from which liability arises consists of various essential elements including the disregard or violation of a legal duty. And so, actionable negligence is sometimes said to be the failure to exercise the *424 care which an ordinarily prudent person would employ under the existing and surrounding circumstances in the discharge of the duty.
It is in the law the duty of a tavern-keeper to exercise reasonable care, vigilance, and prudence to protect his guests from injury from the disorderly acts of other guests. Vide, Kiener v. Steinfeld, 137 N.J.L. 679 (E. & A. 1948); 28 Am. Jur. 577, sec. 54; 52 Am. Jur. 296, sec. 52; 5 Thompson's Commentaries on the Law of Negligence, sec. 6674; Annotation, 106 A.L.R. 1003; 14 R.C.L. 508.
While the standard of care is that of an ordinarily prudent person, yet it must be realized that reasonable care is a relative term in that the degree of care must be commensurate with the risks and dangers attending the activity being pursued. It is a subject of common knowledge that the consumption of a procession of drinks of intoxicating liquors produces a variety of reactions in the deportment of human beings, the development of which emotions the tavern-keeper should be reasonably alert to detect.
In the present case it is conceivable that the ordinarily circumspect and precautious person would have contemplated the likelihood that the course of continuous bantering would eventually culminate in a fight or some similar exhibition of resentment. Human conduct may sensibly be anticipated to follow those propensities which proceed from the natural emotions of the individual aroused by the influences of the situation or environment in which he is placed.
We conclude that it was the function of the jury to determine the actual occurrences, to analyze the character and import of the remarks, their cumulative tendency to arouse resentment and ultimately to incite disorder, and having resolved those features of the evidence, to decide whether the defendant's bartender, amid such conditions and circumstances, exercised or failed to exercise that degree of care and forethought which an ordinarily prudent person would have exercised in the fulfillment of the duty reasonably to protect the plaintiff from injury.
*425 Similarly it was for the jury to appraise the prudence of the conduct of the plaintiff in the circumstances in its relation to the preservation of his own safety. Upon consideration of the principles of law and the permissible deductions from the evidence, the jury rendered a verdict in favor of the plaintiff.
Affirmed.