Sarah B. KLINE, Appellant,

v.

**1500 MASSACHUSETTS AVENUE APARTMENT CORPORATION et al.**

No. 23401.

United States Court of Appeals, District of Columbia Circuit.

Argued April 10, 1970.

Decided Aug. 6, 1970.

Petition for Rehearing Denied Sept. 8, 1970.

MacKinnon, Circuit Judge, dissented and filed opinion.

478

Mr. Albert J. Ahern, Jr., Washington, D. C., for appellant.

Mr. Laurence T. Scott, Washington, D. C., for appellee.

Before TAMM, MacKINNON and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

The appellee apartment corporation states that there is "only one issue presented for review * * * whether a duty should be placed on a landlord to take steps to protect tenants from foreseeable criminal acts committed by third parties". The District Court as a matter of law held that there is no such duty. We find that there is, and that in the circumstances here the applicable standard of care was breached. We therefore reverse and remand to the District Court for the determination of damages for the appellant.

I

The appellant, Sarah B. Kline, sustained serious injuries when she was criminally assaulted and robbed at approximately 10:15 in the evening by an intruder in the common hallway of an apartment house at 1500 Massachusetts Avenue. This facility, into which the appellant Kline moved in October 1959,

is a large apartment building with approximately 585 individual apartment units. It has a main entrance on Massachusetts Avenue, with side entrances on both 15th and 16th Streets. At the time the appellant first signed a lease a doorman was on duty at the main entrance twenty-four hours a day, and at least one employee at all times manned a desk in the lobby from which all persons using the elevators could be observed.[1] The 15th Street door adjoined the entrance to a parking garage used by both the tenants and the public. Two garage attendants were stationed at this dual entranceway; the duties of each being arranged so that one of them always was in position to observe those entering either the apartment building or the garage. The 16th Street entrance was unattended during the day but was locked after 9:00 P.M.

By mid-1966, however, the main entrance had no doorman, the desk in the lobby was left unattended much of the time, the 15th Street entrance was generally unguarded due to a decrease in garage personnel, and the 16th Street entrance was often left unlocked all night. The entrances were allowed to be thus unguarded in the face of an increasing number of assaults, larcenies, and robberies being perpetrated against the tenants in and from the common hallways of the apartment building. These facts were undisputed,[2] and were supported by a detailed chronological listing of offenses admitted into evidence. The landlord had notice of these crimes and had in fact been urged by appellant Kline herself prior to the events leading to the instant appeal to take steps to secure the building.[3]

---

1. Miss Kline testified that she had initially moved into the building not only because of its central location, but also because she was interested in security, and had been impressed by the precautions taken at the main entrance.

2. At trial, the allegations of paragraph 8 of the Complaint—except as they related to the question of notice to the landlord —were stipulated as true. Paragraph 8 reads as follows:

   8. Plaintiff says unto the Court that prior to this assault upon your plaintiff the defendants had been on notice of a *series of assaults, robberies and other criminal offenses* being perpetrated upon its tenants, and yet said defendants while on notice of this dangerous condition negligently failed to hire a sufficient number of guards to impose any of the normal security requirements that in the exercise of due care they owed to plaintiff in her capacity as a tenant, when said defendants were on actual notice of complaints filed by other tenants prior to the assault on your plaintiff, said complaints occurring on the following dates and involving the following apartments:

   (citing 25 individual instances).
   (Emphasis added.)

   During trial, when plaintiff's counsel attempted to pursue the question of the frequency of assaults or other crimes with his witness, the court cut off his examination, since it felt that the point had

already been conceded. Vis, the following:

   Q. Now in your talks with Miss Bloom were you aware between January of 1966 and November of 1966 when you were assaulted of any other assaults or crimes within this apartment house other than what you have already testified to about police cars being present?

   A. It is hard to pin them down to the specific date but there were so many happening. My girl friend's apartment was broken into, five of them within an hour. I don't know what date that was.

   Q. I am not asking for dates. I am asking were you generally aware of offenses and crimes being committed in this apartment complex between January—

   The Court:. You allege that in Paragraph 8 of your complaint and *that was conceded*. (Emphasis added.)

   Mr. Ahern: I stand corrected, Your Honor.

   We also note that on brief, and at oral argument, 1500 Massachusetts Avenue never challenged the assertions of the appellant regarding the frequency of assaults and other crimes being perpetrated against the tenants on their premises. With the record in this posture, we can only conclude that what was alleged and stipulated was what actually occurred.

3. Appellant Kline testified that one could hardly fail to notice the police cars about

Shortly after 10:00 P.M. on November 17, 1966, Miss Kline was assaulted and robbed just outside her apartment on the first floor above the street level of this 585 unit apartment building. This occurred only two months after Leona Sullivan, another female tenant, had been similarly attacked in the same commonway.

## II

At the outset we note that of the crimes of violence, robbery, and assault which had been occurring with mounting frequency on the premises at 1500 Massachusetts Avenue, the assaults on Miss Kline and Miss Sullivan took place in the hallways of the building, which were under the exclusive control of the appellee landlord. Even in those crimes of robbery or assault committed in individual apartments, the intruders of necessity had to gain entrance through the common entry and passageways.[4] These premises fronted on three heavily traveled streets, and had multiple entrances. The risk to be guarded against therefore was the risk of unauthorized entrance into the apartment house by intruders bent upon some crime of violence or theft.

While the apartment lessees themselves could take some steps to guard against this risk by installing extra heavy locks and other security devices on the doors and windows of their respective apartments, yet this risk in the greater part could only be guarded against by the landlord. No individual tenant had it within his power to take measures to guard the garage entranceways, to provide scrutiny at the main entrance of the building, to patrol the common hallways and elevators, to set up any kind of a security alarm system in the building, to provide additional locking devices on the main doors, to provide a system of announcement for authorized visitors only, to close the garage doors at appropriate hours, and to see that the entrance was manned at all times.

The risk of criminal assault and robbery on a tenant in the common hallways of the building was thus entirely predictable; that same risk had been occurring with increasing frequency over a period of several months immediately prior to the incident giving rise to this case; it was a risk whose prevention or minimization was almost entirely within the power of the landlord; and the risk materialized in the assault and robbery of appellant on November 17, 1966.

## III

In this jurisdiction, certain duties have been assigned to the landlord because of his *control* of common hallways, lobbies, stairwells, etc., used by all tenants in multiple dwelling units. This Court in Levine v. Katz, 132 U.S.App.D.C. 173,

---

the building after each reported crime. She further testified that in 1966, before her assault, she herself had discussed the crime situation with Miss Bloom, the landlord's agent at the premises, and had asked her "why they didn't do something about securing the building". Moreover, the record contains twenty police reports of crimes occurring in the buiding in the year 1966, showing that in several instances these crimes were an almost daily occurrence. Such reports in themselves constitute contructive notice to the landlord.

4. The plaintiff testified that she had returned to her apartment after leaving work at 10:00 PM. We are in agreement with the trial court that her assailant was an intruder. *See* the court's comment in note 24, *infra*.

That such intruders did enter apartments from the hallways is substantiated by the Police reports which appear in the Record. In a number of instances doors are described as having been forced; in another instance, a tenant surprised a man standing in his front hallway; and there are still more instances of female tenants being awakened in the early morning hours to find an intruder entering their front doors. We also take notice of the fact that this apartment building is of the high rise type, with no easily accessible means of entry on the floors above the street level except by the hallways.

174, 407 F.2d 303, 304 (1968), pointed out that:

It has long been well settled in this jurisdiction that, where a landlord leases separate portions of property and reserves under his own control the halls, stairs, or other parts of the property for use in common by all tenants, he has a duty to all those on the premises of legal right to use ordinary care and diligence to maintain the retained parts in a reasonably safe condition.

While Levine v. Katz dealt with a physical defect in the building leading to plaintiff's injury, the rationale as applied to predictable criminal acts by third parties is the same.[5] The duty is the landlord's because by his control of the areas of common use and common danger he is the only party who has the *power* to make the necessary repairs or to provide the necessary protection.

As a general rule, a private person does not have a duty to protect another from a criminal attack by a third person. We recognize that this rule has sometimes in the past been applied in landlord-tenant law, even by this court.[6] Among the reasons for the application of this rule to landlords are: judicial reluctance to tamper with the traditional common law concept of the landlord-tenant relationship; the notion that the act of a third person in committing an intentional tort or crime is a superseding cause of the harm to another resulting therefrom; the oftentimes difficult problem of determining foreseeability of criminal acts; the vagueness of the standard which the landlord must meet; the economic consequences of the imposition of the duty; and conflict with the public policy allocating the duty of protecting citizens from criminal acts to the government rather than the private sector.

But the rationale of this very broad general rule falters when it is applied to the conditions of modern day urban apartment living, particularly in the circumstances of this case. The rationale of the general rule exonerating a third party from any duty to protect another from a criminal attack has no applicability to the landlord-tenant relationship in multiple dwelling houses. The landlord is no insurer of his tenants' safety, but he certainly is no bystander. And where, as here, the landlord has notice of repeated criminal assaults and robberies, has notice that these crimes occurred in the portion of the premises exclusively within his control, has every reason to expect like crimes to happen again, and has the exclusive power to take preventive action, it does not seem unfair to place upon the landlord a duty to take those steps which are within his power to minimize the predictable risk to his tenants.

This court has recently had occasion to review landlord-tenant law as applied to multiple family urban dwellings. In Javins v. First National Realty Corporation,[7] the traditional analysis of a lease as being a conveyance of an interest in land—with all the medieval connotations this often brings—was reappraised, and found lacking in several respects. This court noted that the value of the lease to the modern apartment dweller is that it gives him "a well known package of goods and services—a package which includes not merely walls and ceilings, but also adequate heat, light and ventilation, serviceable plumbing facilities, *secure windows and doors,* proper sanitation, and proper maintenance."[8] It does not give him the land itself, and to the tenant as a practical matter this is supreme-

---

5. Kendall v. Gore Properties, 98 U.S.App. D.C. 378, 236 F.2d 673 (1956).

6. Applebaum v. Kidwell, 56 App.D.C. 311, 12 F.2d 846 (1926); Goldberg v. Housing Authority of Newark, 38 N.J. 578, 186 A.2d 291, 10 A.L.R.3d 595 (1962); *but see* Ramsay v. Morrissette, D.C.App.,

252 A.2d 509 (1969) and Kendall v. Gore Properties, *supra,* note 5.

7. 138 U.S.App.D.C. 369, 428 F.2d 1071 (1970).

8. *Id.* 138 U.S.App.D.C. at 372, 428 F.2d at 1074, (emphasis added).

ly unimportant. Speaking for the court, Judge Wright then went on to state, "In our judgment the trend toward treating leases as contracts is wise and well considered. Our holding in this case reflects a belief that leases of urban dwelling units should be interpreted and construed like any other contract." [9]

Treating the modern day urban lease as a contract, this court in *Javins, supra,* recognized, among other things, that repair of the leased premises in a multiple dwelling unit may require access to equipment in areas in the control of the landlord, and skills which no urban tenant possesses. Accordingly, this court delineated the landlord's duty to repair as including continued maintenance of the rented apartment throughout the term of the lease, rightfully placing the duty to maintain the premises upon the party to the lease contract having the capacity to do so, based upon an implied warranty of habitability. [10]

█ In the case at bar we place the duty of taking protective measures guarding the entire premises and the areas peculiarly under the landlord's control against the perpetration of criminal acts upon the landlord, the party to the lease contract who has the effective capacity to perform these necessary acts.

As a footnote to *Javins, supra,* Judge Wright, in clearing away some of the legal underbrush from medieval common law obscuring the modern landlord-tenant relationship, referred to an innkeeper's liability in comparison with that of the landlord to his tenant. "Even the old common law courts responded with a different rule for a landlord-tenant relationship which did not conform to the model of the usual agrarian lease. Much more substantial obligations were placed upon the keepers of inns (the only multiple dwelling houses known to the common law)."

Specifically, innkeepers have been held liable for assaults which have been committed upon their guests by third parties, if they have breached a duty which is imposed by reason of the innkeeper-guest relationship. By this duty, the innkeeper is generally bound to exercise reasonable care to protect the guest from abuse or molestation from third parties, be they innkeeper's employees, fellow guests, or intruders, if the attack could, or in the exercise of reasonable care, should have been anticipated. [11]

Liability in the innkeeper-guest relationship is based as a matter of law either upon the innkeeper's supervision, care, or control of the premises, [12] or by reason of a contract which some courts have implied from the entrustment by the guest of his personal comfort and safety to the innkeeper. In the latter analysis, the contract is held to give the guest the right to expect a standard of treatment at the hands of the innkeeper which includes an obligation on the part of the latter to exercise reasonable care in protecting the guest. [13]

Other relationships in which similar duties have been imposed include landowner-invitee, businessman-patron, em-

9. *Id.* 138 U.S.App.D.C. at 373, 428 F.2d at 1075.

10. The landlord's duty to repair was held to include the leased premises in Whetzel v. Jess Fisher Management Co., 108 U.S.App.D.C. 385, 282 F.2d 943 (1960). In that case, we held that the Housing Regulations altered the old common law rule, and further, that the injured tenant had a cause of action in *tort* against the landlord for his failure to discharge his duty to repair the premises. Our recent decision in Kanelos v. Kettler, 132 U.S.App.D.C. 133, 406 F.2d 951 (1968), reaffirms the position taken in *Whetzel.*

11. An excellent discussion of the innkeeper's duty to his guest, including citations to relevant case material, is found in: Annot., 70 A.L.R.2d 621 (1960).

12. Gurren v. Casperon, 147 Wash. 257, 265 P. 472 (1928). *See also* Fortney v. Hotel Rancroft, Inc., 5 Ill.App.2d 327, 125 N.E.2d 544 (1955).

13. McKee v. Sheraton-Russell, Inc., 268 F.2d 669 (1959) (applying New York law).

ployer-employee, school district-pupil, hospital-patient, and carrier-passenger.[14] In all, the theory of liability is essentially the same: that since the ability of one of the parties to provide for his own protection has been limited in some way by his submission to the control of the other, a duty should be imposed upon the one possessing control (and thus the power to act) to take reasonable precautions to protect the other one from assaults by third parties which, at least, could reasonably have been anticipated. However, there is no liability normally imposed upon the one having the power to act if the violence is sudden and unexpected provided that the source of the violence is not an employee of the one in control.[15]

We are aware of various cases in other jurisdictions following a different line of reasoning, conceiving of the landlord and tenant relationship along more traditional common law lines, and on varying fact situations reaching a different result from that we reach here. Typical of these is a much cited (although only a 4–3) decision of the Supreme Court of New Jersey, Goldberg v. Housing Authority of Newark, *supra* relied on by appellee landlord here. There the court said:

> Everyone can foresee the commission of crime virtually anywhere and at any time. If foreseeability itself gave rise to a duty to provide "police" protection for others, every residential curtilage, every shop, every store, every manufacturing plant would have to be patrolled by the private arm of the owner. And since hijacking and attack upon occupants of motor vehicles are also foreseeable, it would be the duty of every motorist to provide arm-

ed protection for his passengers and the property of others. Of course, none of this is at all palatable.[16]

This language seems to indicate that the court was using the word *foreseeable* interchangeably with the word *possible*. In that context, the statement is quite correct. It would be folly to impose liability for mere possibilities. But we must reach the question of liability for attacks which are foreseeable in the sense that they are *probable* and *predictable*. Thus, the United States Supreme Court, in Lillie v. Thompson [17] encountered no difficulty in finding that the defendant-employer was liable to the employee because it "was aware of conditions which created a likelihood" of criminal attack.

In the instant case, the landlord had notice, both actual and constructive, that the tenants were being subjected to crimes against their persons and their property in and from the common hallways. For the period just prior to the time of the assault upon appellant Kline the record contains unrefuted evidence that the apartment building was undergoing a rising wave of crime. Under these conditions, we can only conclude that the landlord here "was aware of conditions which created a likelihood" (actually, almost a certainty) that further criminal attacks upon tenants would occur.

Upon consideration of all pertinent factors, we find that there is a duty of protection owed by the landlord to the tenant in an urban multiple unit apartment dwelling.

Summarizing our analysis, we find that this duty of protection arises, first of all, from the logic of the situation itself. If we were answering without the benefit of any prior precedent the issue as posed

---

14. Cases involving these relationships are collected and summarized in Goldberg v. Housing Authority of Newark, 38 N.J. 578, 186 A.2d 291, 10 A.L.R.3d 595 (1962).

15. *See:* Central of Georgia R. Co. v. Hopkins, 18 Ga.App. 230, 89 S.E. 186 (1916); Martincich v. Guardian Cab

Co., 10 N.Y.S.2d 308 (1938, City Ct. N.Y.); and Callender v. Wilson, La.App., 162 So.2d 203, writ refused 246 La. 351, 164 So.2d 352 (1964).

16. 38 N.J. 578, 186 A.2d 291, 293, 10 A.L.R.3d 595, 601 (1962).

17. 332 U.S. 459, 68 S.Ct. 140, 92 L.Ed. 73 (1947).

by the appellee landlord here, "whether a duty should be placed on a landlord to take steps to protect tenants from foreseeable criminal acts committed by third parties," we should have no hesitancy in answering it affirmatively, at least on the basis of the facts of this case.

As between tenant and landlord, the landlord is the only one in the position to take the necessary acts of protection required. He is not an insurer, but he is obligated to minimize the risk to his tenants. Not only as between landlord and tenant is the landlord best equipped to guard against the predictable risk of intruders, but even as between landlord and the police power of government, the landlord is in the best position to take the necessary protective measures. Municipal police cannot patrol the entryways and the hallways, the garages and the basements of private multiple unit apartment dwellings. They are neither equipped, manned, nor empowered to do so. In the area of the predictable risk which materialized in this case, only the landlord could have taken measures which might have prevented the injuries suffered by appellant.

We note that in the fight against crime the police are not expected to do it all;[18] every segment of society has obligations to aid in law enforcement and to minimize the opportunities for crime. The average citizen is ceaselessly warned to remove keys from automobiles and, in this jurisdiction, may be liable in tort for any injury caused in the operation of his car by a thief if he fails to do so, notwithstanding the intervening criminal act of the thief, a third party. Gaither v. Myers, 131 U.S.App.D.C. 216, 404 F.2d 216 (1968). In addition, auto manufacturers are persuaded to install special locking devices and buzzer alarms, and real estate developers, residential communities, and industrial areas are asked to install especially bright lights to deter the criminally inclined. It is only just that the obligations of landlords in their sphere be acknowledged and enforced.[19]

18. In this regard, we observe that in some of the relationships in which a duty of protection has been found, the courts display no compunction in requiring the use of security guards or special police, where their use is reasonably necessary to see to the safety of those under the control of another. Thus, in Dilley v. Baltimore Transit Co., 183 Md. 557, 39 A.2d 469 (1944), the court said:

Carriers are not required to furnish a police force sufficient to overcome all violence of other passengers or strangers, when such violence is not to be reasonably expected; but the carrier is required to funish *sufficient police force to protect its passengers* from the assaults or violence of other passengers or strangers which might reasonably be expected, and to see that its police perform their duty. (Emphasis supplied.) *See also* Amoruso v. New York City Transit Authority, 12 A.D.2d 11, 207 N.Y.S.2d 855 (1960); and Dean v. Hotel Greenwich Corp., 21 Misc.2d 702, 193 N.Y.S.2d 712 (1959).

19. In Kendall v. Gore Properties, *supra*, note 3, this court recognized that the obligation of the landlord to his tenant includes the duty to protect him against criminal acts of third parties. The District of Columbia Court of Appeals, not-

ing this in Ramsay v. Morrissette, *supra*, said of the imposition of this duty on the landlord:

Such a duty was found in Kendall v. Gore Properties, 98 U.S.App.D.C. 378, 236 F.2d 673 (1956), where the landlord's employee, alleged to be of unsound mind, strangled to death a tenant whose apartment he was painting. The negligence in *Kendall*, however, was the failure to make any investigation whatever of the employee before hiring him to work, without supervision, in the apartment of a young woman, living alone. The court did say that the tenant, under her lease, paid both for shelter and protection. It said further:

"We have heretofore made clear as to apartment houses, the reasons which underlie the landlord's duty under modern conditions and which, as to various hazards call for at least 'reasonable or ordinary care, which means reasonably safe conduct, but there is no sufficient reason for requiring less.' True, the landlord does not become a guarantor of the safety of his tenant. But, if he knows, or in the exercise of ordinary care ought to know, of a possibly dangerous situation and fails to take such steps as an ordinarily prudent

Secondly, on the rationale of this court in Levine v. Katz, Kendall v. Gore Properties, and Javins v. First National Realty Corporation, *supra,* there is implied in the contract between landlord and tenant an obligation on the landlord to provide those protective measures which are within his reasonable capacity. Here the protective measures which were in effect in October 1959 when appellant first signed a lease were drastically reduced. She continued after the expiration of the first term of the lease on a month to month tenancy. As this court pointed out in *Javins, supra,* "Since the lessees continue to pay the same rent, they were entitled to expect that the landlord would continue to keep the premises in their beginning condition during the lease term. It is precisely such expectations that the law now recognizes as deserving of formal, legal protection." [20]

Thirdly, if we reach back to seek the precedents of common law, on the question of whether there exists or does not exist a duty on the owner of the premises to provide protection against criminal acts by third parties, the most analogous relationship to that of the modern day urban apartment house dweller is not that of a landlord and tenant, but that of innkeeper and guest. We can also consider other relationships, cited above, in which an analogous duty has been found to exist.

## IV

We now turn to the standard of care which should be applied in judging if the landlord has fulfilled his duty of protection to the tenant. Although in many cases the language speaks as if the standard of care itself varies, in the last analysis the standard of care is the same— reasonable care in all the circumstances.[21]

person, in view of existing circumstances, would have exercised to avoid injury to his tenant, he may be liable. (citations omitted)"

The court also stressed that *'particular* conduct, *depending upon circumstances,* can raise an issue for the jury to decide in terms of negligence and proximate cause'. Id. at 384, 236 F.2d at 679. (Footnotes omitted)

The language that the District of Columbia Court of Appeals quoted from *Kendall* signals the extension of a rule theretofore applied only to injuries caused by defects or obstacles in areas under the landlord's control (see Levine v. Katz, *supra),* to criminal acts of third parties. By our decision today, we merely amplify and refine our reasoning in *Kendall.*

20. Javins v. First National Realty Corp., *supra,* note 7, 138 U.S.App.D.C. 377, 428 F.2d 1079. With reference to some duties imposed by law upon the landlord for the benefit of the tenant, it may not be possible for landlords to contract out of their obligations. It has been held that a lease clause is invalid if it would insulate landlords "from the consequences of violations of their duties to the public under both the common law and the District of Columbia Building Code * * *." Tenants Council of Tiber Island—Carrolsburg Square v. DeFranceaux, 305 F. Supp.· 560, 563 (D.C.D.C.1969).

21. Kermarec v. Compagnie Generale, 358 U.S. 625, 631, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959) ; Hecht Co. v. Jacobsen, 86 U.S.App.D.C. 81, 83, 180 F.2d 13, 15 (1950).

To refer to only one factor as illustrative, we recognize that the obligations to which landlords of various types of property are held may well increase as the individual tenant's control over his own safety on the landlord's premises decreases; conversely, as the tenant's control over his own safety increases, the landlord's obligations should decrease. Possibly because of the great degree of control exercised by a carrier over a passenger, many courts have held carriers to the exercise of the greatest measure of care with respect to the safety of their passengers, and in some instances, have held carriers to have the liability of insurers. Yet when the passenger is injured at a terminal or station (where the passenger has more, and the carrier has less, control over the safety of his person), the obligations of the carrier are less. In this regard compare McPherson v. Tamiami Trail Tours, 383 F.2d 527 (5 Cir. 1967) with Neering v. Illinois Central Railway Co., 383 Ill. 366, 50 N.E.2d 497, conformed to 321 Ill.App. 625, 53 N.E.2d 271 (1943). *See also* Federal Insurance Company v. Colon, 392 F.2d 662, 665 (1968), where the U.S. Court of Appeals for the First Circuit,

The specific measures to achieve this standard vary with the individual circumstances. It may be impossible to describe in detail for all situations of landlord-tenant relationships, and evidence of custom amongst landlords of the same class of building may play a significant role in determining if the standard has been met.

In the case at bar, appellant's repeated efforts to introduce evidence as to the standard of protection commonly provided in apartment buildings of the same character and class as 1500 Massachusetts Avenue at the time of the assault upon Miss Kline were invariably frustrated by the objections of opposing counsel and the impatience of the trial judge. At one point during appellant's futile attempts, the judge commented with respect to the degree of proof required to show a custom: "I think the old proverb that one swallow does not make a summer applies. If you can get 100 swallows, you say this must be summertime."

Later, but still during appellant's efforts on this point, the judge commented to opposing counsel,

> [M]ay I remind you that it is very dangerous to win a case by excluding the other side's testimony because the Court of Appeals might say that testimony should have been admitted even though you might have won the case with the testimony in.

Appellant then attempted to offer evidence of individual apartment houses with which she was familiar. The trial judge became impatient with the swallow by swallow approach, and needled by opposing counsel's objections, disregarded his own admonition and cut short appellant's efforts in this direction. The rec-

ord as to custom is thus unsatisfactory, but its deficiencies are directly chargeable to defendant's counsel and the trial judge, not appellant.

■ We therefore hold in this case that the applicable standard of care in providing protection for the tenant is that standard which this landlord himself was employing in October 1959 when the appellant became a resident on the premises at 1500 Massachusetts Avenue. The tenant was led to expect that she could rely upon this degree of protection. While we do not say that the precise measures for security which were then in vogue should have been kept up (e.g., the number of people at the main entrances might have been reduced if a tenant-controlled intercom-automatic latch system had been installed in the common entryways),[22] we do hold that the same relative degree of security should have been maintained.

The appellant tenant was entitled to performance by the landlord measured by this standard of protection whether the landlord's obligation be viewed as grounded in contract or in tort. As we have pointed out, this standard of protection was implied as an obligation of the lease contract from the beginning. Likewise, on a tort basis, this standard of protection may be taken as that commonly provided in apartments of this character and type in this community, and this is a reasonable standard of care on which to judge the conduct of the landlord here.[23]

## V

Given this duty of protection, and the standard of care as defined, it is clear

---

upon referring to the plaintiff's assertion that a public carrier owes its patrons the greatest measure of care, said:

> [T]his applies only to passengers who are in the actual course of travel or who are boarding or alighting. The overwhelming majority rule is that it does not apply to the carrier's premises generally. * * * (citing cases)

For the imposition of more stringent obligations constituting a standard of rea-

sonable care in the innkeeper-guest relationship, *see* Fortney v. Hotel Rancroft, Inc., 5 Ill.App.2d 327, 125 N.E.2d 544 (1955).

**22.** *See* text at 478, *supra.*

**23.** The record indicates that just prior to the poor people's campaign, the landlord caused an electric security system to be installed at the subject apartment building.

that the appellee landlord breached its duty toward the appellant tenant here.[24] The risk of criminal assault and robbery on any tenant was clearly predictable, a risk of which the appellee landlord had specific notice, a risk which became reality with increasing frequency, and this risk materialized on the very premises peculiarly under the control, and therefore the protection, of the landlord to the injury of the appellant tenant. The question then for the District Court becomes one of damages only. To us the liability is clear.

Having said this, it would be well to state what is *not* said by this decision. We do not hold that the landlord is by any means an insurer of the safety of his tenants. His duty is to take those measures of protection which are within his power and capacity to take, and which can reasonably be expected to mitigate the risk of intruders assaulting and robbing tenants. The landlord is not expected to provide protection commonly owed by a municipal police department; but as illustrated in this case, he is obligated to protect those parts of his premises which are not usually subject to periodic patrol and inspection by the municipal police. We do not say that every multiple unit apartment house in the District of Columbia should have those same measures of protection which 1500 Massachusetts Avenue enjoyed in 1959, nor do we say that 1500 Massa-

24. In an apparent attempt to show that, regardless of the amount of care exercised, the landlord here could not possibly have prevented an assault such as that which had befallen the plaintiff, the following cross examination of Miss Kline was undertaken:

Q. Is it also correct that this apartment building also houses office apartments?

A. As the years went by they were putting more and more offices into the building, yes, sir.

Q. What type of offices would they be?

A. Well, I understood they were supposed to be professional offices because I tried to get my name listed once.

Q. Irrespective of whether you tried to get your name listed or not, did you observe the offices?

A. Yes, I worked for some of them.

Q. What type of organizations had their offices there?

A. Manufacturing representatives; there was a lawyer's office, maybe two; there were some engineers; there were some tour salesmen. That is all I can think of right now.

Q. So that there would be then in the course of a normal day clients going in and out of the lawyers' offices or customers going in and out of the other type offices, would that be correct?

A. Yes.

Q. And they would be able to walk in even if there was a doorman there?

A. Yes.

Q. And one would only speculate as to whether or not anyone could ever leave or not leave, isn't that also correct?

A. What do you mean, speculate if one could leave or not leave?

To which the trial court commented:

THE COURT: Well, we assume the general public would come into any office building or in any big apartment house.

* * * * *

THE COURT: The point is though that an intruder who commits this kind of an assault is apt to act a little different from the rest of the public although it does not always follow, you never know. Of course an intruder is not likely to come in through a public entrance either.

To this we add our own comment that it is unlikely in any case that a patron of one of the businesses, even if disposed to criminal conduct, would have waited for five hours after the usual closing time to perpetrate his crime—especially one of a violent nature. Further, although it is not essential to our decision in this case, we point out that it is not at all clear that a landlord who permits a portion of his premises to be used for business purposes and the remainder for apartments would be free from liability to a tenant injured by the criminal act of a lingering patron of one of the businesses. If the risk of such injury is foreseeable, then the landlord may be liable for failing to take reasonable measures to protect his tenant from it.

We note parenthetically that no argument regarding any change in the character of the building or its tenants was pursued on appeal.

chusetts Avenue should have precisely those same measures in effect at the present time. Alternative and more up-to-date methods may be equally or even more effective.

Granted, the discharge of this duty of protection by landlords will cause, in many instances, the expenditure of large sums for additional equipment and services, and granted, the cost will be ultimately passed on to the tenant in the form of increased rents. This prospect, in itself, however, is no deterrent to our acknowledging and giving force to the duty, since without protection the tenant already pays in losses from theft, physical assault and increased insurance premiums.

The landlord is entirely justified in passing on the cost of increased protective measures to his tenants, but the rationale of compelling the landlord to do it in the first place is that he is the only one who is in a position to take the necessary protective measures for overall protection of the premises, which he owns in whole and rents in part to individual tenants.

Reversed and remanded to the District Court for the determination of damages.

MacKINNON, Circuit Judge (dissenting):

I respectfully dissent from the panel decision that the plaintiff has proved liability as a matter of law. My inability to join in that disposition of the case is based primarily in my disagreement as to what facts were proved at the trial of that issue by the court without a jury. In my view the panel opinion errs by overstating the facts which might be construed as being favorable to appellant and by failing to recognize gross

deficiencies in appellant's proof, thereby applying a more strict standard of responsibility to the landlord than the opinion actually states to be the law.

One difficulty here is that the trial court sitting without a jury held as a matter of law that there was no rule requiring the operator of the apartment building to use due care to exclude intruders by locking doors or posting doormen at entrances so as to protect tenants against crimes committed by intruders and others. It never considered whether the facts proved liability if the duty did exist. Against such a procedural background the panel opinion here comes to a different conclusion on the duty owed by the landlord to its tenants and then proceeds to find defendant liable on the facts as a matter of law. This necessarily involves a *de novo* consideration of the facts on a cold record and subjects the result to all the imperfections inherent in any decision arrived at under such handicaps. Here, those handicaps are magnified by the fact that the case was tried to the court without a jury and this necessarily had some tendency to steer the facts toward the issues that became uppermost in the court's mind as the case progressed and away from the issues upon which the court now reverses the trial court. The result in my view is a record that cannot support the panel decision.

The central issue here is what are the obligations incident to a landlord-tenant relationship at 1500 Massachusetts Avenue, N.W., near downtown Washington. Involved is a large building of 585 units composed of a combination of business offices and apartments on the first floor and the next level and of residential apartments above.[1]

---

1. At oral argument in the trial court plaintiff's attorney pointed out that the building did not have tenants exclusively but also had law offices, some business offices and establishments and the public had a right to park in the garage and that all kinds of people came into the building because they had business there. Defense counsel also made the uncontested statement at oral argument in this court

that the building "was at the time she rented and is now more than just an apartment house. There are business offices throughout at least on the first floor and I believe on the level above. * * * No matter how many guards you have people will be going into or can say they are going into, business offices." Plaintiff Kline lived on the "level above" the ground floor and at one time had re-

Central to the conclusion of the panel opinion is its frequent assertion, directly and inferentially stated, that numerous *"assaults* and robberies" had been occurring in the hallways of the building and hence "the risk of criminal *assault* and robbery on a tenant in the common hallways of the building was thus entirely predictable. * * * " (Emphasis added). In support of this conclusion the opinion states that "the *same risk* had been occurring with increasing frequency over a period of several months immediately prior to the incident giving rise to this case. * * * " (Emphasis added) and refers to 20 police reports of alleged offenses which had occurred in the building in the first ten months of 1966. But an examination of all 20 of these reports indicates that only *one* of them involved an assault and robbery. The rest were chiefly thefts. So the panel opinion is incorrect in basing its conclusion on the allegation that the landlord had "notice of repeated criminal *assaults* and robberies." [2] (Emphasis added.) The sole prior instance of an *assault* and robbery occurred on September 6, 1966 at 8:10 P.M. in front of apartment #125 involving one Leona Sullivan. It was attempted by two men who fled when another tenant came out of an adjoining apartment. It seems elementary that *one solitary instance* of an *assault* and robbery is an insufficient base to support a finding that *assaults* and robberies are a "predictable risk" from which the landlord would have "every reason to expect *like crimes* to happen again." (Emphasis added.) One swallow just does not make a summer. Assaults of this character are not predictable from clandestine thefts. It is accordingly my conclusion that the panel opinion concludes too much from too little.

Also, in my view the record is deficient on the matter of notice to the landlord of any assaults. The landlord had notice of some thefts (inaccurately sometimes referred to as robberies) but the record does not support any notice of any assault. A stipulation as to the offenses only went to the fact that they were committed in the building, not that the landlord had notice of all of them. He did admit notice of some of them but there is no proof that the landlord had notice of the *assault* committed in the building upon Leona Sullivan. This was the *only* prior assault committed on the premises. Proof of notice was central to appellant's case and the absence of proof of notice I consider to be fatal. I find no proof the appellee had actual notice of such fact. As for constructive notice, that could have been proved by showing the knowledge of some of the employees, which was not done. Clearly, knowledge of some offenses by appellant was not notice to appellee (App.54). Neither were requests for improved security.

The evidence introduced by the plaintiff is also deficient in my opinion in not proving that the alleged negligence was the proximate cause of the assault or that it contributed to it in any way. Plaintiff's evidence did not negate that it was a tenant, guest or person properly on the property who committed the offense, and while the panel opinion throughout asserts that an "intruder" committed the offense, there is no proof of that fact. So plaintiff's evidence failed to prove a nexus between the alleged deficiencies of the appellee and the cause of any damage to appellant.

The panel opinion also fails to recognize that 1500 Massachusetts Avenue is *not* a luxury type apartment, but instead is a *combination office building and apartment building* with some com-

---

quested defendant's permission to have her apartment listed as a professional office. She was a qualified public stenographer. It is concluded from the foregoing that some businesses were on the same floor as appellant's apartment outside of which the assault occurred.

2. In this particular the panel opinion ignores the actual police reports to which the stipulation referred and which speak for themselves. They were all admitted in evidence and only *one* reported an assault; that on Leona Sullivan.

merical and professional offices interspersed with apartments located on the ground and second floor of the building (where subject offense occurred).[3]

At the trial the court and counsel took frequent notice of well known factors affecting the quality of the accommodations in this and other areas of the city and of their effect on 1500 Massachusetts Avenue. It was recognized that Washington is a crime ridden city,[4] that the area around 1500 Massachusetts Avenue in 1966 was different from areas on Connecticut and Wisconsin Avenues where "maybe the crime wave had not yet extended" (App.91) and that those "down in the center of town * * * · were put on rather quick and active notice" of the crime wave. (App.92). In fact this thesis was central to appellant's case and it was so argued (App.105). All this indicated that the character of the surrounding area had been deteriorating, a fact of which the appellant was well aware as her testimony indicated she had knowledge of increasing crime in the area, that "as the years went by they were putting more and more offices into the building" and reducing the personnel services to tenants.

Obviously since a number of business offices occupied the lower floors, the fortress type security precautions the panel opinion finds to be required would be wholly out of the question because such offices require free public access. The degree of protection appellant seeks could only be afforded by the equivalent of policemen patrolling the corridors which even if it were practical for the upper apartment areas would be impractical for the floors housing business offices where this assault occurred.

The panel opinion attempts to liken the law involving this combination office-apartment building to the law relating to hotels and innkeepers,[5] but even with respect to hotels the law recognizes that the reasonable care which an innkeeper must exercise for the safety and comfort of his guests varies with the grade and quality of the accommodation offered by the hotel.[6] The panel cites the note in 70 A.L.R.2d 621 (1960) in support of its claim. That note revolves around a Minnesota case deciding that the operator of a beer establishment owes a duty to its patrons to exercise reasonable care to protect them from injury at the hands of an intoxicated patron on the premises. Such law has no application to the facts here. The A.L.R. note cited by the panel does make minor reference to hotels and assault and battery but the cases discussed therein give little or no support to the thesis of negligence advanced by the panel opinion. Kingen v. Weyant, 148 Cal.App.2d 656, 307 P.2d 369 (1957) is cited for the principle that an innkeeper's duty is limited to the exercise of reasonable care and he is "liable only when he was negligent in receiving or harboring guests of *known violent or vicious propensities.*" (Emphasis added). Annot., 70 A.L.R.2d, *supra* at 646. Gurren v. Casperson, 147 Wash. 257, 265 P. 472 (1928) is a similar case holding that a guest in a hotel assaulted by another guest who was intoxicated, after the guest had expressly warned the landlord and requested protection from this specific person, may recover his damages from the hotel owner. Fortney v. Hotel Rancroft, 5 Ill.App.2d 327, 125 N.E.2d 544 (1955) is another case described in the note. Therein, a new trial was ordered to determine the hotel's responsibility where an intruder, found in the guest's room when he returned after being out several hours, struck the guest and caused the loss of an eye. At issue was how the intruder had gained admis-

---

3. *See* note 1 *supra.*

4. The court remarked: "I think we ought to take for granted we live in a crime ridden city and that people are attacked on the street and in hallways ot apartment houses and hallways of office buildings." (App. 71.)

5. Actually the security precautions the majority finds appellant was entitled to would exceed the security precautions available in Washington hotels.

6. McKee v. Sheraton-Russell, Inc., 268 F. 2d 669 (2d Cir. 1959); 40 Am.Jur.2d Hotels, Motels, etc. § 82 (1968).

sion to the room with the key in the possession of the night clerk and without being noticed by the night clerk. These cases obviously have little or no application here.

Actually the obligation of innkeepers toward their guests is the exercise of reasonable care for their safety.[7] The present status of the law in this respect is well stated in Coca v. Arceo, 71 N.M. 186, 376 P.2d 970, 973 (1962):

> Naturally, an innkeeper is not and cannot be an insurer of a guest or patron against personal injuries inflicted by another person on the premises, other than his servants or agents. Nevertheless, the proprietor of a place of business who holds it out to the public for entry for his business purposes, is subject to liability to guests who are upon the premises and who are injured by the harmful acts of third persons *if, by the exercise of reasonable care, the proprietor could have discovered that such acts were being done or about to be done, and could have protected against the injury by controlling the conduct of the other patron.* 2 Restatement, Torts, § 348 (1934 ed.); Central Theatres v. Wilkinson, 1944, 154 Fla. 589, 18 So.2d 755; Hill v. Merrick, 1934, 147 Or. 244, 31 P.2d 663; 29 Am.Jur. 50, Innkeepers, § 62; Rawson v. Massachusetts Operating Co., 1952, 328 Mass. 558, 105 N. E.2d 220, 29 A.L.R.2d 907; Gartner v. Lombard Bros. (3d Cir. 1952), 197 F.2d 53.

Illustrative of the weight of authority on this duty of care is Peck v. Gerber, 1936, 154 Or. 126, 59 P.2d 675, 106 A.L.R. 996, in which the court stated:

> A guest or patron of such an establishment has a right to rely on the belief that he is in an orderly house and that the operator, personally or by his delegated representative, is exercising reasonable care to the end that the doings in the house shall be orderly.

See also Gurren v. Casperson, 1928, 147 Wash. 257, 265 P. 472; Reilly v. 180 Club, Inc., 1951, 14 N.J.Super. 420, 82 A.2d 210. In addition, there are extensive annotations (106 A.L.R. 1003, and 70 A.L.R.2d 628, at 645). (Emphasis added).

The italicized portion of the quotation is indicative of the true holding of these cases with respect to innkeepers. It is that the landlord is liable if by the exercise of reasonable care he could have discovered that the offensive acts were being done or were about to be done and he could have protected against the injury by controlling the offender and failed to do so. The predictability of the offensive acts in the cited cases is much more immediate than is here present. Actually, the holding in the panel opinion extends the rule applicable to innkeepers to inordinate lengths and in my view to an unreasonable extent based as it is here upon a single assault and robbery over two months before.

Another deficiency I find in appellant's case is that she failed to prove the prevailing security standard for similar type apartments in the community at the time. This is another fatal defect in her proof. The panel opinion attempts to gloss over this deficiency by saying that it was caused by appellee's objections to the evidence and by the impatience of the judge. But the transcript indicates (App.55–62) that the proffered testimony was improper, largely hearsay, based on an insufficient foundation and that appellant's lawyer, after being helpfully advised by the court as to the proper procedure and the proper type of witnesses to prove such facts purposely waived any right to introduce such evidence when he stated, "I do not think it [the evidence of the practice in the area] is that material to the issue here, Your Honor." Also, the appellant who was her only witness on the point indicated that she only had personal knowledge of the practices at one other apartment at the time in 1966 when this assault occur-

---

7. 40 Am.Jur.2d Hotels, Motels, etc. § 82 n. 16 (1968).

red, and that was obviously insufficient to prove the necessary standard prevailing in the area. The court also stated, "I will allow the question" as to the practice in the building where appellant was then residing and she so testified as to this single location; but that was obviously insufficient to prove the prevailing standard in the area. So appellant's case is deficient in this vital respect since the absence of any evidence (or proffer thereof) is not corrected by trying to blame the defendant and the court for not admitting what was obviously improper (hearsay) evidence. A negligence case must still be based on some evidence or proffer thereof.

As for the claim that appellant was led to believe she would get the same standard of protection in 1966 that was furnished in 1959, there is obviously nothing to this point. She was not led to expect that. She personally observed the changes which occurred in this respect. They were obvious to her each day of her life. And since her original lease had terminated and her tenancy in 1966 was on a month to month basis, whatever contract existed was created at the beginning of the month and since there was no evidence of any alteration in the security precautions during the current month, there is no basis for any damage claim based on contract.

The panel opinion is an excellent argument for a high degree of security in apartments and many of its contentions have considerable weight to them but in my opinion they overstate the security that can reasonably be afforded. The hysteria of apartment dwellers in an inner city plagued with crime [8] is understandable but they are not any more exposed there than they are on the streets or in office buildings and they cannot expect the landlord to furnish the equivalent of police protection that is not available from the duly constituted government in the locality.[9] In my opinion the decision in Goldberg v. Housing Authority of Newark, 38 N.J. 578, 186 A.2d 291, 10 A.L.R.2d 595 (1962) answers all appellant's arguments. It is just too much, absent a contractual agreement, to require or expect a combination office-apartment building such as is involved here to provide police patrol protection or its equivalent in the block-long, well-lighted passageways. Yet nothing short of that will meet the second guessing standard of protection the panel opinion practically directs. If tenants expect such protection, they can move to apartments where it is available and presum-

8. This court is well aware of the high level of crime in various areas of Washington. About two-thirds of our cases on appeal presently involve criminal offenses. Also the daily newspapers are full of the details of various crimes. The Washington Post of June 19, 1970, p. B 5, stated: "Asleep in rooms, 5 guests robbed in downtown hotel." The story referred to three rooms on the ninth floor of the Statler Hilton Hotel, one of the most prestigious in the city. This is five times as many robberies as had occurred at 1500 Massachusetts Avenue prior to this case. Under the panel opinion, now the Statler Hilton Hotel would practically be required to patrol the upper hotel rooms. The *Post* news story also reported 21 daylight robberies, 4 assaults and 8 thefts, all of which occurred before 6 P.M. This is a fairly typical day in Washington.

9. Plaintiff's complaint here is partly based on the claim that the landlord was required to maintain a reasonable number of guards. The allegation of the complaint alleged that appellee was negligent in not "taking reasonable precautions in the evening hours of maintaining a *reasonable* number of guards upon the premises so as to protect your plaintiff in her person and in her property." (Emphasis added.) To require apartment landlords to employ guards to protect tenants against criminal depredations would be very costly and raise many troublesome questions. How much training should they have? Should such guards be armed? What would be their liability and that of the landlord if they killed an alleged offender in the commission of a criminal act? When duly appointed and trained city policemen are subjected to grand jury indictment for killing criminals caught in the act, the liability and exposure of an apartment house guard and his landlord to criminal and civil process under similar circumstances could be very substantial.

ably pay a higher rental, but it is a mistake in my judgment to hold an office-apartment building to such a requirement when the tenant knew for years that such protection was not being afforded.

In its overzealous attempt to assist the apartment dweller, the panel opinion is forcing a contrary result. The panel opinion calls for "protection" of the tenant by the landlord without describing the degree thereof. The stated standard is thus vague, but in the light of the facts of this case (see footnote 2 relying upon plaintiff's allegation that appellee "failed to hire sufficient number of guards"), it is an extremely high standard that borders on insuring tenants that the corridors of office-apartment buildings (and hence many apartment buildings) will not be used for the commission of criminal offenses. Owners of apartments in their own self interest will be required to view this standard, particularly in light of our jury trial practices, as being incapable of assured compliance and thus be forced to contract against such unreasonable liability (both as to character and amount) by contracting for exculpatory provisions in leases.[10] Thus tenants will get less instead of more protection and the panel opinion by imposing an unreasonable standard in this case is not rendering any real service to reasonable landlord-tenant relations.

Finally, I find absolutely no basis for the panel to conclude on the record below that negligence has been proved as a matter of law and to order a trial on the question of damages only. If the court wanted to absolve appellant from responsibility for his failure to produce competent evidence in the trial of the case the most that it could properly do, in my opinion, would be to remand the entire case for a new trial on the new rules of law here espoused for the first time. In such a trial appellant would also be required to introduce some evidence to overcome the rule of law that a private person does not owe a duty to protect another person from a criminal attack by a third person unless such attack was both foreseeable and arose from the private person's negligent conduct.[11]

It is my conclusion that appellant did not sustain her burden of proof that the

---

10. The parties contract on substantially an equal footing and since the panel opinion stresses the contractual base for its decision, it follows that the base could be altered by contract. See 38 Am.Jur. Negligence § 8 (1941). Certainly the added protection of a private police force is not a service that goes with every apartment building in a metropolitan area. Or in the alternative, the tenants could be given an option to pay the cost of private police protection which would include salary, training, equipment, liability insurance, protection devices, office space, etc., and if they declined the option the landlord would be absolved from any liability. The option in such case serves to put the parties artificially on the same level. 38 Am.Jur. Negligence § 8 n. 5.5 (1969), citing 175 A.L.R. 17.

Tenants Council v. DeFranceaux, 305 F.Supp. 560 (D.C.D.C.1969) is not to the contrary. It dealt with an exculpatory clause for swimming pool facilities which had been represented by the landlord to be available to prospective tenants without additional charge. Under such circumstances the District Court found the requirement that tenants agree to the exculpatory clause in order to gain the use of the pool facilities to be contrary to public policy and without consideration.

11. See 38 Am.Jur. Negligence §§ 70, 71, pp. 726–729 (1941), and 2 Restatement of Torts 2d § 448 (1965) where the rule is stated as follows:

The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.

I fail to see that the conduct of the appellee created any temptation to third persons to commit criminal acts on the premises. What the panel talks about as risk in the building is nothing more than a reduction of the general risk that prevails in the community.

owner of the apartment building failed to exercise reasonable care and I would affirm the decision of the very distinguished and learned trial judge. Accordingly, I dissent.