(No. 27004.—Reversed and remanded.)

AGNES NEERING, Appellant, *vs.* ILLINOIS CENTRAL RAILROAD COMPANY, Appellee.

*Opinion filed May 20, 1943—Rehearing denied Sept. 15, 1943.*

368

Smith, J., specially concurring.

Ringer, Reinwald & Sostrin, (M. Lester Reinwald, and Morris Sostrin, of counsel,) for appellant.

John W. Freels, and Herbert J. Deany, (Edward C. Craig, Vernon W. Foster, and Charles A. Helsell, of counsel,) for appellee.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

Agnes Neering filed a complaint in the circuit court of Cook county against the defendant, the Illinois Central Railroad Company, asking for damages because of injuries suffered on September 6, 1938, as a result of being assaulted while she was awaiting the arrival of a suburban train at the Riverdale station of defendant's railroad. A trial before the court and a jury resulted in a verdict in her favor of $5000. The court overruled defendant's motion for a judgment notwithstanding the verdict and for a new trial and entered judgment on the verdict. On appeal to the Appellate Court for the First District the judgment of the circuit court was reversed and the cause remanded with directions to enter judgment notwithstanding the verdict for the defendant and against the plaintiff. We have allowed a petition for appeal to this court.

The evidence in this record establishes the following facts: Agnes Neering, 23 years of age, lived at Riverdale, Illinois, and for several years prior to September 6, 1938, had been employed as a waitress at Harvey, about three miles south of Riverdale. She used the defendant's suburban service to go to her work at Harvey and for several years she had regularly taken a southbound train from the One Hundred Thirty-seventh street Riverdale station at 4:59 A. M. For some time prior to August 15, 1938, she had been accompanied by her sister. About that time, however, her sister gave up her job in anticipation of her approaching marriage and thereafter plaintiff took the train alone. She was known by the regular employees on this train and occasionally they held the train for her when she was late. Plaintiff's home was three blocks west of defendant's railroad and a half block south of One Hundred Thirty-eighth street. At that hour of the morning the sisters seldom saw any automobile traffic or people

on One Hundred Thirty-eighth street. Plaintiff and her sister both testified that in 1937 and 1938 they saw hoboes and tramps once or twice, and sometimes three or four times a week, on the Riverdale station platform; that occasionally the hoboes would be sleeping and often the girls would be afraid to go into the warming house which was provided by defendant for the use of patrons of the road. Plaintiff also testified that she often saw such men walking on the right of way and both plaintiff and her sister testified to complaints made to the ticket agent.

Plaintiff further testified that on September 6, 1938, she went alone to the Riverdale station following her regular route down One Hundred Thirty-eighth street and entered the platform from that end. She testified that she then walked all the way to the warming house on the north end of the platform; that she saw no one on or about the platform and seated herself in the waiting room; that while she was seated there a colored man entered, came up to her and pressed his knees against hers so she could not move, grabbed her by the throat and tried to choke her; that she started to scream and he knocked her to the floor, sitting on her stomach and hitting her with a blackjack; that she told him someone was coming and in the confusion got up, passed him, and backed out of the door; that she turned and ran screaming down the platform and he caught her toward the south end and knocked her off the platform, at which time her back struck a rail; that her assailant then jumped down, pulled her under the platform, hit and choked her, went through her purse, took two rings off her hand, a pin off her dress and put them in his pocket; that he then raped her and fled; that he kept her under the platform from three to five minutes and left from the east side going north along the tracks; that she climbed up on the platform by some two-by-four props; that after she got on the platform she boarded the southbound train to Harvey and told the conductor what had

happened; that she got off the train at Harvey and went to the restaurant where she worked; that she went to the kitchen, washed up and put on her uniform not realizing how badly she was hurt; that in about ten minutes she tried to walk but could hardly move and was taken to the Illinois Central Hospital. A physical examination was made which showed she was suffering from a slight swelling and discoloration of the right side of the neck, a contusion of the left elbow and superficial excoriations of the left shoulder. After leaving the hospital she was confined to her bed for about six weeks and was off from work for about fourteen months.

The evidence reveals that the station itself was located in a rather isolated section of Riverdale, being not only isolated from all street traffic and passersby but was located in the heart of a railroad and switching center which was infested with tramps, hoboes and other undesirable characters either coming in or leaving Chicago and its vicinity. One block to the north at One Hundred Thirty-sixth street, the Pennsylvania and Baltimore and Ohio freight lines intersected and cut under the defendant's right of way. At One Hundred Fortieth street, two blocks to the south, the Michigan Central, the New York Central and the Indiana Harbor Belt Railway freight lines intersected and cut under the defendant's right of way. At this particular place of intersection a long spur track ran from the New York Central, Michigan Central and the Indiana Harbor's tracks up to and connected with defendant's tracks. This spur formed a "Y" in which was a hollow known as "Hobo Jungle." The triangle forming the "Y" spur, and known as "Hobo Jungle," formed windbreaks and hoboes and tramps occupied the place, constantly loitering there and waiting to catch trains. Three police officers of Riverdale and one of the adjoining village of Dolton, testified to the network of railroads in and about Riverdale and to the presence of hoboes and tramps in that territory in 1937

and 1938. All of the freight lines, including the main freight and passenger lines of the Illinois Central from the southland, brought in many hoboes, bums and vagrants, white and colored, to the city of Chicago.

Plaintiff testified that she would see these tramps and hoboes in the waiting room or on the platform; that they were both black and white and when she saw these tramps she would stay outside and wait for the train in both cold and warm weather; that she complained to the ticket agent and told him she could not go into the waiting room in the morning, even when it was chilly, on account of the tramps sleeping there; that it was dangerous and she was afraid. The sister of plaintiff, who took the same train to Harvey as plaintiff until she gave up her job in August, 1938, likewise testified to the fact that the One Hundred Thirty-seventh street station was habitually infested three or four times a week with tramps and hoboes, white and black, shabbily dressed, and that she also made complaints repeatedly to the agent in charge of the station when she returned from work in the afternoon.

The evidence reveals that although plaintiff and her sister repeatedly notified defendant's station agent of this dangerous condition and that they were afraid, during the entire eight months' period preceding the assault, the defendant failed to have a single inspection made or a station attendant present at or about the time plaintiff boarded her train daily.

Lester Brookfelt, assistant chief of police of Riverdale, testified to the dangerous conditions existing at the station. He testified that while cruising by in the squad car while on night duty, he had been on the One Hundred Thirty-seventh street station platform about one hundred times during 1937 and 1938; possibly fifty times, generally at night, between January 1 and September 1, 1938, and he stated that on twenty-five or thirty of these occasions he and his police companion had removed hoboes and

tramps from the platforms at the One Hundred Thirty-seventh street station, both black and white, and took them to the local jail. He also testified as to "Hobo Jungle" at One Hundred Fortieth street and the Illinois Central right of way; that they broke up the camp and sent them on their way or put them in the station, but it would start right up again.

Officer Grover Cogswell was also subpoenaed by plaintiff and he testified that during 1937 and 1938 he likewise found hoboes, both white and colored, on the One Hundred Thirty-seventh street station, in the summer and fall of 1938, when he helped out the Riverdale police and that they were ragged and dirty. Many other witnesses testified as to the hoboes and tramps who loitered around the platform at the One Hundred Thirty-seventh street station in 1937 and 1938.

The defendant offered testimony to the effect that plaintiff and her sister had used the station daily at 5:00 o'clock A. M. for several years; that the platform of defendant's station was well lighted at all times; that besides the lights in the warming house, there were 24 lights on the platform; that four of these lights were over the ledge on each side of the warming house; that others were in each of the windbreaks and at other points on the platform and there were also three high-lights over the walkway between the platform and One Hundred Thirty-eighth street; that there were lights on the stairs leading to the subways and in the subways. The defendant contends that neither plaintiff nor her sister testified to a single incident which might have put defendant on guard; that there was no testimony that plaintiff had ever been molested or even spoken to in those five years.

Further evidence was offered by the crew of the northbound train that on the day in question they passed the Riverdale station southbound at 3:56, and that there were no loiterers on the platform on either trip that day. Con-

ductor Schaefer testified for the defendant that he had been on these runs for three years and on each trip daily the train stopped at the station where he could see into the warming house; that he often saw passengers waiting, but in those three years had never seen a hobo or bum on the platform on either the four or five o'clock stop. The crew of the southbound train, which plaintiff regularly took, testified they had never seen a bum or loiterer on the Riverdale station or in the warming house on the five o'clock run.

We have set out above the testimony rather fully for the reason the question presented to this court is solely whether there is any evidence fairly tending to support plaintiff's cause of action. This, of course, brings us to the question as to whether or not the defendant afforded sufficient protection for its passengers at its station platform to prevent such passengers, including plaintiff, from being unlawfully assaulted and molested. It is conceded that plaintiff was a passenger after arriving on the station platform and that defendant owed her the duty of ordinary care. The rule requiring the highest degree of care on the part of railroad companies for the protection of passengers applies only to the operation of trains and immediate incidents of transportation, and as to station buildings and other appurtenances the carrier is required to exercise only ordinary care to keep them in a reasonably safe condition for use. *Davis* v. *South Side Elevated Railroad Co.* 292 Ill. 378.

Defendant contends that it is not required to guard against injuries resulting from unusual or unexpected occurrences which could not have been reasonably anticipated, while plaintiff declares that she does not contend that defendant was required to guard against injuries resulting from unusual occurrences which could not be reasonably anticipated, but insists that it was a question of fact for

the jury to determine whether or not, from all of the evidence, defendant failed to afford her the degree of protection required, from dangers of which it had knowledge, or which, in the exercise of due care and diligence, it could have reasonably anticipated and provided against. Apparently there is not dissent by either party from the above statements of the law.

Plaintiff charges in her complaint that the defendant failed in this regard, and the question before this court is whether the Appellate Court erred in reversing the trial court's denial of defendant's motion for a judgment notwithstanding the verdict entered in the trial court. The Civil Practice Act and Rule 22 of this court require the court to be governed by the same rules in passing upon a motion for judgment notwithstanding the verdict as govern it in passing upon a motion for a directed verdict. The power of the court is the same in both cases, the reason being that the motions are, in effect, the same. On a motion for judgment notwithstanding the verdict the question presented in the trial court or on appeal from a judgment granting such motion, is whether there is any evidence which, taken with its intendments most favorable to the plaintiff, tends to prove the charge of the complaint, and if there is in the record evidence which, standing alone, tends to prove the material allegations, the motion should be denied, even though, upon the entire record, the evidence may preponderate against the plaintiff so that the verdict would not stand when tested by motion for new trial. (*Walaite* v. *Chicago, Rock Island and Pacific Railway Co.* 376 Ill. 59.) This requires, in passing upon such motion, consideration of the evidence, but precludes any examination of the weight of the evidence to determine its preponderance, it being immaterial on which side the weight of the evidence preponderates. *Nelson* v. *Stutz Chicago Factory Branch, Inc.*, 341 Ill. 387.

Defendant contends that it had no notice or knowledge that plaintiff might be assaulted and that such an assault could not be reasonably anticipated merely because of the presence, even though frequent, of tramps on or about the station. This brings us at once to the decisive question in this case as to whether or not the defendant, in allowing hoboes, tramps and vagrants to loiter about its station, to sleep in its waiting room, of which it had notice, created a condition which became a menace to the public peace and to patrons using its passenger station; and that from such condition the defendant could reasonably anticipate some unlawful act might be committed on patrons using its passenger station and, as a result, use reasonable care for their protection.

A vagrant is one who strolls from place to place; an idle wanderer; specifically, one who has no settled habitation; a vagabond. In statutory law in Great Britain and in various States in the United States, a vagrant is arbitrarily defined to include any of the various offenders against good order, or persons liable to become a menace to the public peace or a public burden. (Webster's New International Dictionary.) Persons who are idle and dissolute, who neglect all lawful business and are habitually found prowling around steamboat landings and railroad depots, shall be deemed to be, and they are, declared to be vagabonds. (Ill. Rev. Stat. 1941, chap. 38, par. 578.) A vagabond ordinarily means a vagrant or homeless wanderer without means of honest livelihood. (43 Words & Phrases, p. 642.) This class recognized as hoboes or vagrants is commonly known as a class not living according to the standards of normal individuals and are offenders of good order and liable to become a menace to the public peace. The law recognizes, and it is generally understood, that where lawbreakers congregate they are dangerous to society and are likely to break other laws, and we do not

see how it could reasonably be said when vagrants are permitted to congregate they will not become a menace to the public peace or that under such conditions one could not reasonably anticipate they might commit some unlawful act or become dangerous to society. It necessarily follows that, when such a condition is permitted to exist at a passenger station, reasonable and ordinary precaution must be observed for the protection of persons who are patrons of the road and using its passenger station.

It is urged by the defendant that plaintiff had been using the station for a long time and had not been assaulted, and that no assault by vagrants had been made on other passengers using the station, therefore the defendant had no knowledge and could not reasonably anticipate that vagrants or any other person would assault plaintiff. Of course, if defendant had known plaintiff would be assaulted, and made no effort for her protection, certainly there would have been a failure on its part to exercise reasonable and ordinary care. The question however, is, from the conditions which defendant permitted to exist around its station, could it reasonably anticipate that plaintiff might be assaulted and as a consequence observe reasonable precaution to prevent it. It is our judgment the conditions were such that defendant ought reasonably to have anticipated plaintiff might be assaulted and that there is some evidence that reasonable precaution was not taken for her protection.

In the case of *Exton* v. *Central Railroad Co.* 62 N. J. L. 7, it appeared that the plaintiff was knocked down and injured by some boisterous cabmen while on her way from the station platform to the baggage room of the defendant company for the purpose of checking her baggage. The cabmen were not in the employ of the defendant. In sustaining the ruling of the trial judge denying a motion for nonsuit at the close of the plaintiff's evidence, the Supreme

Court said: "Carriers of passengers are bound to exercise the utmost care in maintaining order and guarding those they transport against violence from whatever source arising, which might be reasonably anticipated or naturally expected to occur. * * * The carrier must exercise the care required to protect the passenger from violence even by a stranger. * * * The general rule is clear that from whatever source the danger may arise, if it be known or should have been known, care must be exercised to protect the passenger from that danger." 15 A. L. R. 894.

In *Houston and Texas Central Railroad Co.* v. *Phillio,* 96 Texas, 18, wherein it appeared that the plaintiff and his wife were assaulted in a railroad station, it was held that when the plaintiff's wife entered the station and purchased a ticket she became a passenger of the defendant, and the duty devolved on the company's agent to protect her against assault on the part of intruders, provided it knew of such misconduct or had reasonable grounds to anticipate it. See, also, 15 A. L. R. 894.

In the case of *Chicago and Alton Railroad Co.* v. *Pillsbury,* 123 Ill. 9, referred to in the briefs of both parties, this court, at page 24, said: "None of the officers had any knowledge the rioters intended to or had any purpose to attack defendant's passenger train at Brighton Park, or elsewhere, at that or at any other time. * * * But defendant ought reasonably to have anticipated the mob might attack its train to reach the object of their vengeance, so soon as it had passed from the protection of the police, and precautionary measures should have been taken."

Defendant contends that it was not informed of the fact that plaintiff was about to be assaulted or had been threatened with an assault and urges there is no similarity between the above case and the instant case; that in the *Pillsbury case* a passenger on a train was injured when strikers attacked the train in order to get the strikebreakers

carried thereon and because the very same thing had happened before though under slightly different circumstances, the court held the defendant should have anticipated that such an assault might happen again; and while it is true the factual situation in that case is different from the instant case, that case did hold the defendant guilty and plaintiff was not required to prove that he had been assaulted or was about to be assaulted or had been threatened with an assault. The court held the defendant ought reasonably to have anticipated the mob might attack its train and that it was reasonable to anticipate that through such mob violence, someone might be injured. In the instant case the evidence reveals that defendant permitted a condition to exist of which some evidence reveals it had knowledge, and while it might not have known of anyone being assaulted, it did have knowledge of the condition which might reasonably result in such an assault and it might reasonably anticipate such an assault, requiring reasonable precautions to be observed for its prevention. The evidence reveals that, notwithstanding plaintiff's repeated warnings and complaints that the Riverdale station was infested with tramps and hoboes, that it was dangerous and she was afraid, the defendant railroad failed to take a single precautionary step for the protection of plaintiff during the eight months complained of. Knowledge of conditions which are likely to result in an assault upon a passenger, or which constitute a source of potential danger, imposes the duty of active vigilance on the part of the carrier's agents and the adoption of such steps as are warranted in the light of the existing hazards. Thus, a conductor who knows that there are strikers and strikebreakers on the same train is under an obligation to take steps to prevent an outbreak of violence between them, and, for his failure to exercise care and precaution under such circumstances, an innocent passenger injured by the fighting

of the strikers and strikebreakers may recover from the carrier. (10 Am. Jur. par. 1458, p. 270.) Likewise where a railroad company knows there are hoboes and vagrants congregating around its passenger station and waiting room in sufficient number to constitute a source of potential danger likely to result in assault upon passengers, it is under an obligation to exercise reasonable care and caution for its prevention.

Defendant further contends that even though it had been guilty of negligence on the occasion in question, the criminal act of the colored man was an intervening cause and defendant's negligence was not the proximate cause of plaintiff's injury and that the abnormal criminal act of the third person broke the chain of causation. It cannot be denied that if the negligence of the defendant only furnishes a condition and that condition causes an injury by the subsequent independent act of a third person, the creation of the condition is not the proximate cause of an injury. However, the rule is that the subsequent independent act, in order to break the causal connection, must be one, the intervention of which was not probable or foreseeable by the first wrongdoer. What constitutes proximate cause has been defined in numerous decisions, and there is practically no difference of opinion as to what the rule is. The injury must be the natural and probable result of the negligent act or omission and be of such a character as an ordinarily prudent person ought to have foreseen as likely to occur as a result of the negligence, although it is not essential that the person charged with negligence should have foreseen the precise injury which resulted from his act. (*Illinois Central Railroad Co.* v. *Oswald,* 338 Ill. 270; *Hartnett* v. *Boston Store of Chicago,* 265 Ill. 331.) An intervening efficient cause is a new and independent force which breaks the causal connection between the original wrong and the injury and itself becomes the direct and immediate cause of the injury.

(*Illinois Central Railroad Co.* v. *Oswald,* 338 Ill. 270; *Pullman Palace Car Co.* v. *Laack,* 143 Ill. 242.) The intervention of independent concurrent or intervening forces will not break causal connection if the intervention of such forces was itself probable or foreseeable. (*Wintersteen* v. *National Cooperage and Woodenware Co.* 361 Ill. 95; *Sycamore Preserve Works* v. *Chicago and Northwestern Railroad Co.* 366 Ill. 11.) What is the proximate cause of an injury is ordinarily a question of fact to be determined by a jury from a consideration of all of the evidence. *Phillabaum* v. *Lake Erie and Western Railroad,* 315 Ill. 131.

The rule that the causal connection between a person's negligence and an injury is broken by the intervention of a new, independent, efficient and intervening cause so that the negligence is not actionable is subject to the qualification that if the intervening cause was foreseen or reasonably might have been foreseen by the wrongdoer, his negligence may be considered the proximate cause of the injury and he may be held liable notwithstanding the intervening cause. The intervening act of a third person does not necessarily relieve the author of an earlier negligent or wrongful act from responsibility when the intervening cause of an injury is of such nature as could reasonably have been anticipated, in which case the earlier negligent act, if it contributed to the injuries, may be regarded as the proximate cause. *Garibaldi & Cuneo* v. *O'Connor,* 210 Ill. 284; *Armour* v. *Golkowska,* 202 Ill. 144.

The last contention of defendant is that it has complied with all its statutory duties relating to the operation of its station and that the Illinois Commerce Commission had power under section 57 of the Public Utilities Act, (Ill. Rev. Stat. 1941, chap. 111⅔, par. 61,) to make additional requirements if it saw fit, but none had been ordered relating to this station. Proof of compliance with the safety rules of the Commerce Commission constitutes evi-

dence tending to show due care but is not conclusive on the question of negligence.

In analyzing the cases cited both for the appellant and appellee, we find that the factual situations in most of them are at variance with the instant case and some present only abstract propositions of law which are not applicable to the facts as they exist in this case.

It is fundamental that plaintiff could recover only by proof of specific charges of negligence made in her complaint, and it must further appear that such negligence proximately contributed to or caused the injuries for the damages here sought. It is also fundamental that proof of negligence consists of showing a duty to the person injured, a breach of that duty and an injury proximately resulting from such breach. Here the duty charged against defendant was its duty to afford protection to passengers, including plaintiff, from dangers of which it had knowledge or which, in the exercise of due care and diligence, it could have reasonably anticipated and provided against.

We have carefully reviewed the evidence only for the purpose of determining whether or not there is any evidence tending to establish plaintiff's cause of action. Having decided this question in the affirmative, the judgment of the Appellate Court is reversed and the cause remanded to that court with directions to consider the assignments of error raised in that court other than the one here decided and to either affirm the judgment of the court below or reverse that judgment and remand the cause.

*Reversed and remanded, with directions.*

Mr. Justice Smith specially concurring: I concur in the result but not in all the language of the opinion.