**Marie CORNPROPST et al., Appellants,**

v.

**Marcus SLOAN, Jr., et al., Appellees.**

Supreme Court of Tennessee.

Sept. 29, 1975.

Frank L. White, Paul, White, Hallman & Keolz, Memphis, for appellants.

Thomas D. Yeaglin, Armstrong, Allen, Braden, Goodman, McBride & Prewitt, Memphis, for appellees.

OPINION

FONES, Chief Justice.

The question on this appeal is whether the complaint states a cause of action against merchants who are members of a shopping center association, for personal injuries to an invitee resulting from a sudden criminal assault by a third party, on a shopping center parking lot.

The trial judge dismissed the action pursuant to motion made under Rule 12.02(6), Tennessee Rules of Civil Procedure.

Named as parties defendant, in addition to plaintiff's assailant, were the owners and managers of the Eastgate Shopping Center in Memphis and its lessees, the owners and operators of the various business establishments housed in the shopping center complex.

This appeal only involves one of these, viz., Top Value Enterprises. The trial judge treated Top Value's motion to dismiss as a "pilot motion." He directed the entry of final judgment as to it and, pursuant to Sec. 27–305 T.C.A., permitted an appeal and certified the existence of a controlling question of law. Judgment was withheld as to all remaining defendants. All requirements of the statute have been met and the case is before this Court for review.

I.

The record reflects that the trial judge conducted a hearing upon the motion to dismiss; the proceedings, consisting solely of argument of counsel and the dialogue among the court and counsel.

Top Value, the *successful party*, made application to the court for leave to file a Bill of Exceptions incorporating these mat-

ters into the record. The court, relying upon *Anderson v. Carter*, 512 S.W.2d 297 (Tenn.App.1974), and over the objection of counsel for plaintiff, entered an order granting permission to file this so-called bill of exceptions, and the same is physically a part of the record before us. We find nothing in *Anderson v. Carter* which would permit a non-appealing successful party to file a bill of exceptions.

Rule 12.02(6), Tennessee Rules of Civil Procedure permits a party to move to dismiss for "failure to state a claim upon which relief can be granted." A motion grounded on this portion of the rule is the equivalent of a demurrer, under former practice, *State v. Minimum Salary Department of A. M. E. Church, Inc.*, 477 S.W.2d 11 (Tenn.1972) and, as a demurrer, it is a test of the sufficiency of the leading pleading. Nothing said in argument on such a motion can add to or take from the complaint. It must stand or fall upon its allegations unaffected by the approbation of its author or the denunciations of the defense, as expressed in oral argument. Hence a bill of exceptions is neither necessary nor proper in such cases.

Appellant's motion to strike appellee's bill of exceptions is sustained.

## II.

A Rule 12.02(6) motion, as a demurrer, admits the truth of all relevant and material averments contained in the complaint, *Garrison v. Graybeel*, 202 Tenn. 567, 308 S.W.2d 375 (1957); but asserts that such facts do not constitute a cause of action. *Henderson v. Lawrence*, 212 Tenn. 247, 369 S.W.2d 553 (1963).

The first four (4) Paragraphs of the complaint assert that the approximately thirty-seven (37) tenant-merchants comprising the shopping center are members of an association known as the Eastgate Shopping Center Association, designed to promote their respective businesses and protect their economic interests.

We quote the material portion of the complaint verbatim:

"5. On October 18, 1973, at or around 8:00 p. m. to 8:30 p. m., Plaintiff, Marie Cornpropst, came to the Eastgate Shopping Center for the purpose of shopping. Plaintiff was therefore an invitee. It was dark. Plaintiff parked her vehicle in front of Defendant Woolco store and went in there to shop. Having made her purchases, and after leaving said store, as the Plaintiff was preparing to re-enter her vehicle in order to depart from said shopping center, the Defendant, Marcus Sloan, Jr., suddenly drove up by the side of her car, jumped out, violently grabbed the Plaintiff, with whom he wrestled and fought and tried to force her from her vehicle into his vehicle. The Defendant Sloan viciously attacked the Plaintiff and beat her about the person as she resisted with all her might and screamed for help. When certain rescurers came running to the scene, Defendant Sloan jumped into his vehicle and sped away. Plaintiff had never before seen this Defendant and in no way provoked this malicious assault. Plaintiff was beaten and bruised by Defendant about her entire body and shocked and dazed by the suddenness and viciousness of his assault and attack upon her, injuring Plaintiff severely. The employees of Defendant Woolco refused to permit the rescurers of this Plaintiff from using Woolco's phone in order to call the police for help.

6. Prior to this attack upon the Plaintiff there had been committed various crimes, assaults, and other acts of violence, either on the premises or in the immediate area of the Eastgate Shopping Center, which rendered said vicinity unsafe and potentially dangerous, particularly for the individual female shopper at nighttime. Throughout the times and afterwards of these criminal occurrences which preceded the incident complained of herein, there were no security guards posted, no precautions taken and no other protective measures used or installed in the East-

gate Shopping Center premises for the safety of customers; nor did any employee of Woolco or other merchant Defendants herein offer to see Plaintiff safely to her car. Each and every member of the Eastgate Shopping Center Association, or other tenant in said shopping center owed a duty to the Plaintiff invitee to provide adequate measures to prevent harm to her from acts of violence.

7. Defendant Woolco was negligent in that it knew, or in the exercise of reasonable and ordinary care should have known in the aftermath of crimes or acts of violence abovementioned, that the Plaintiff invitee would be exposed to potential danger and personal harm, and unprotected against criminal acts especially if shopping at its store at night, and this Defendant took no precautions to protect customers and this Plaintiff from unlawful attacks and the harm that ensued to the Plaintiff. In addition, Defendant Woolco, through its agents and employees, was put on notice that the Plaintiff had been brutally assaulted and refused to assist her when the request for use of its telephone was made in order to call police.

8. Each and every one of the other named Defendants comprising the Eastgate Shopping Center Association, and Defendants Union Realty Company and Cross-Country Realty Company, who are the landlords and/or lessors/lessees of said merchant Defendants, was negligent in that each one knew or in the exercise of reasonable and ordinary care should have known that the Plaintiff, an invitee, would be exposed to the likelihood of potential danger and personal harm and unprotected against criminal acts, especially at night while the stores were open, and that these Defendants, individually and collectively as a class, failed to take adequate precautions to protect its customers and this Plaintiff from personal harm from this assault and battery upon her person.

Defendants Union Realty Company and Cross-Country Realty Company, as well as Defendant Woolco and all others herein comprising the Eastgate Shopping Center Association were negligent in failing to provide security guards or some patrolling of the parking area or escort service or other high visibility security measures, or warning of potential danger, for the safety of this Plaintiff, when they knew or should have known of the likelihood of danger and harm under hazardous conditions of nighttime parking and shopping on a huge parking lot on premises and in a neighborhood where acts of violence and criminal activity had theretofore occurred."

The trial judge was of the opinion that *Thomas v. General Electric Company*, 494 S.W.2d 493 (Tenn.1973), controlled this case and required its dismissal. While this Court is in disagreement as to the correct rule to be applied and the disposition of the case in its present posture, all agree that *Thomas* is not controlling and that we have no Tennessee case directly in point.

### III.

At common law, a private person or corporation, as distinguished from governmental units, had no duty whatsoever to protect others from the criminal acts of third parties. That general rule has remained steadfast in the tort law of this country, despite the exceptions that have appeared from time-to-time, where special relationships and special circumstances have combined to impose liability.

We are dealing with an act of nonfeasance, the failure to take steps to protect another from harm, as distinguished from misfeasance, or active misconduct causing positive injury to others.

In view of what we regard as an unfortunate extension of tort law by the minority of this Court, we find the following comments of Professor Prosser discussing the evolution of acts of nonfeasance, are appropriate:

"—The highly individualistic philosophy of the older common law had no great difficulty in working out restraints upon the commission of affirmative acts of harm, but shrank from converting the courts into an agency for forcing men to help one another."

"Liability for nonfeasance was therefore slow to receive recognition in the law. It first appears in the case of those engaged in 'public' callings, who, by holding themselves out to the public, were regarded as having undertaken a duty to give service, for the breach of which they were liable. This idea still survives in the obligation of common carriers, innkeepers, public warehousemen, and public utilities to serve all comers. With the development of the action of assumpsit, this principle was extended to anyone who, for a consideration, has undertaken to perform a promise or what we now call a contract. During the last century, liability for 'nonfeasance' has been extended still further to a limited group of relations, in which custom, public sentiment and views of social policy have led the courts to find a duty of affirmative action. It is not likely that this process of extension has ended. For the most part such a duty has been imposed where the relation is of some actual or potential economic advantage to the defendant, and the expected benefit justifies the requirement of special obligations. The largest single group upon whom the duty of affirmative conduct has been imposed are the owners and occupiers of land,—"

> Prosser, Law of Torts,
> 4th Edition, Section 56,
> page 339.

As indicated, in some American jurisdictions, various special relationships combined with special conditions and circumstances have resulted in the imposition of liability for failure to take steps to protect another from harm as a result of criminal acts.

Common carriers, who owe a high degree of care to their passengers in all circumstances, have been held liable to passengers for the criminal acts of others, in special circumstances.

A passenger on a vessel where a bar was maintained was assaulted by a drunken passenger who had been involved in a disturbance earlier and defendant failed to restrain or watch the offender. *Quigley v. Wilson Line of Massachusetts*, 338 Mass. 125, 154 N.E.2d 77, 77 A.L.R.2d 499 (S.Jud. Ct.Mass.1958).

In *Neering v. Illinois Central Railroad Company*, 383 Ill. 366, 50 N.E.2d 497 (1943), a lady was criminally attacked while waiting for a train on the station platform at an early morning hour. She had expressly complained and the railroad had knowledge that hobos and tramps regularly loitered on the station premises and warmed therein. No steps whatever were taken to prevent the loitering or protect the passengers and the railroad was held liable.

In our own case of *Railroad v. Hatch*, 116 Tenn. 580, 94 S.W. 671 (1906), the Court stated the rule to be that absent reasonable grounds for an apprehension of danger, the railroad would not be liable for an attack on one passenger by another. A lady passenger was assaulted in a sleeper car around midnight and there was proof that the conductor and porter assigned to the car had been absent for about two (2) hours.

The Court pointed out that non-liability for the criminal acts perpetrated upon a passenger was a limitation upon the general liability of carriers and that in this case the absence of the conductor and porter from their posts of duty was negligence on the part of the railroad which directly contributed to the occurrence of the assault on the plaintiff. The significance of *Hatch* to our inquiry is that where the highest degree of care characterized the relationship, the criminal acts of third parties imposes no liability unless there are present special circumstances that create in the minds of reasonable men an apprehension of danger.

The cases involving liability for the criminal acts of third persons are most numerous

involving the innkeeper guest relationship and the patron public amusement owners and operators, including lounges, beer parlors, rock and roll concerts, bowling alleys, etc. In the great majority of cases involving these relationships the offender that perpetrates the criminal act giving rise to the litigation is identified in advance, and liability is predicated on some action or course of conduct of the particular offender that gave notice of the imminent probability of danger.

In the instant case the offender was not, and under the allegations of the bill, could not have been identified in advance of the perpetration of the action (see allegations in paragraph five [5] of the complaint). The complaint relies entirely upon the vague allegation that various crimes, assaults and other acts of violence had been committed either on the premises or in the immediate area.

Vagueness is only one of the factors that have perplexed the courts in dealing with tort liability for criminal acts of third persons. In *Goldberg v. Housing Authority*, 38 N.J. 578, 186 A.2d 291, 10 A.L.R.3d 595 (1962), an invitee on the Housing Authority premises was beaten and robbed. The plaintiff was delivering milk to a tenant at the housing project, and the offenders were unidentified prior to or subsequent to the act. In a four-three decision, the New Jersey Supreme Court held that the owners of the apartment project were under no liability to provide protection from the criminal acts of third parties. The minority of the court substantially disagreed with respect to the facts shown in the record and the inferences to be drawn from the facts.

In *Goldberg*, the apartment project consisted of more than nineteen (19) acres with ten (10) apartment houses of twelve (12) stories, each offering accommodations for fourteen hundred fifty-eight (1458) families. The number of persons residing in the project at the time of the incident was between fifty-three hundred (5,300) and six thousand (6,000). A jury verdict in favor of the plaintiff was affirmed by the Intermediate Appellate Court, reversed and dismissed by the Supreme Court.

The majority and minority opinions discuss numerous leading cases involving most, if not all of the special relationships that have resulted in this character of suit and many special circumstances within such relationships.

In discussing the proposed scope of the duty sought to be imposed on a landlord to protect against criminal acts, (which are equally relevant to a merchant-shopper relationship) the majority of the Court observed:

"The second consideration is the inevitable vagueness of the proposed duty. Fairness ordinarily requires that a man be able to ascertain in advance of a jury's verdict whether the duty is his and whether he has performed it. To which multi-family houses would the duty apply? Would it depend upon the number of tenancies? If so, can we now fix the number? And if the duty springs from a combination of tenancies and prior unlawful events, what kind of offenses will suffice, and in what number, and will crimes next door or around the corner or in the neighborhood, raise the obligation? And if a prescient owner concludes the duty is his, what measures will discharge it? It is an easy matter to know whether a stairway is defective and what repairs will put it in order. Again, it is fairly simple to decide how many ushers or guards suffice at a skating rink or a railroad platform to deal with the crush of a crowd and the risks of unintentional injury which the nature of the business creates, but how can one know what measures will protect against the thug, the narcotic addict, the degenerate, the psychopath and the psychotic? Must the owner prevent *all* crime? We doubt that any police force in the friendliest community has achieved that end."

\* \* \* \* \* \*

"—We assume that advocates of liability do not intend an absolute obligation to

prevent all crime, but rather have in mind some unarticulated level of effectiveness short of that goal. Whatever may be that degree of safety, is there any standard of performance to which the owner may look for guidance? We know of none, and the record does not suggest one, and we are at a loss to understand what standard the jurors here employed. The charge to the jury was unrevealing; it simply left to 12 men and women the task of deciding whether a prudent owner would have done more, and whether, if defendant had, the robbers here would likely have been deterred."

\*     \*     \*     \*     \*     \*

"Not only would there be uncertainty as to *when* the duty to furnish police protection arises, and as to *what* measures will discharge the duty, there would also be exceptional uncertainty with respect to the issue of causation. This is so because of the extraordinary speculation inherent in the subject of deterrence of men bent upon criminal ventures. It would be quite a guessing game to determine whether some unknown thug of unknowable character and mentality would have been deterred if the owner had furnished some or some additional policement. It must be remembered that police protection does not, and cannot, provide assurance against all criminal attacks, and so the topic presupposes that inevitably crimes will be committed notwithstanding the sufficiency of the force. Hence the question of proximate cause is bound to be of exceptional difficulty."

"Thus vagueness would here be conspicuous in all facets of the issue of negligence and causation."

It is also significant that the minority of the New Jersey Supreme Court, in approving the jury verdict of liability to plaintiff, stated the applicable law to be that generally a property owner is not obligated to anticipate and guard against the criminal acts of others but none the less,

"—where there are special conditions from which the owner or operator of the premises should recognize and foresee an *unreasonable risk* or likelihood of harm or danger to invitees from criminal or wrongful acts of others, he must take reasonable precautions which may, under the circumstances, fairly and justly entail the employment of special guards or police." (emphasis supplied)

According to the minority opinion the record in the case contained evidence of numerous complaints of crimes and acts of violence at the project occurring in both daytime and nighttime, such as assaults and rapes or attempted rapes in the halls and elevators of the residential buildings; that minutes of the Housing Authority reflected that the Commission had discussed a killing in one project and a rape in another and the need for properly trained guards and other protective measures; that although these matters had been discussed at a number of meetings between June and October preceding the assault on plaintiff, no protective action had been taken. Weighing this factual situation and applying same to the legal principle stated above, the minority of the New Jersey Court observed as follows:

"It must be borne in mind that in the instant matter the court is not at all concerned with the ordinary private multi-dwelling. or apartment house. There the owner's customary reliance on the measure of protection afforded by the public police force against criminal acts by intruders may perhaps be viewed, as a matter of law, as not unreasonable in relation to the nature of the risk involved. Cf. *Genovay v. Fox*, supra, 50 N.J.Super. [538] at pp. 551–552, 143 A.2d [229] at pp. 235–236. Here, the court is concerned with a special situation in which the defendant has built a high-rise multi-unit housing project which, by virtue of its size, composition and mode of operation, presents special dangers requiring special precautions."

One of the cases relied upon by plaintiffs in the instant suit is *Kline v. 1500 Massa-*

*chusetts Avenue Apartment Corporation,* 141 U.S.App.D.C. 370, 439 F.2d 477, 43 A.L. R.3d 311 (D.C.Cir.1970). Ms. Kline, a tenant in a Washington, D.C. apartment building located at 1500 Massachusetts Avenue was criminally assaulted and robbed at approximately 10:15 p. m. in a common hallway by an unidentified intruder. There was proof that the apartment building fronted on three (3) heavily traveled streets and had multiple entrances; also the record contained some twenty (20) police reports of crimes committed in the building in the year preceding the attack upon the plaintiff. Plaintiff had urged her landlord to take steps to secure the building and two (2) months prior to the attack a similar attack was made on another female tenant in the same hallway.

In a two-to-one decision the Circuit Court of Appeals found the landlord liable as a matter of law, reversing the District Court, and remanding to that Court for the sole purpose of assessing damages. The substance of the majority opinion is found in the following quote:

> "As a general rule, a private person does not have a duty to protect another from a criminal attack by a third person. We recognize that this rule has sometimes in the past been applied in landlord-tenant law, even by this court. Among the reasons for the application of this rule to landlords are: judicial reluctance to tamper with the traditional common law concept of the landlord-tenant relationship; the notion that the act of a third person is committing in intentional tort or crime is a superseding cause of the harm to another resulting therefrom; the oftentimes difficult problem of determining foreseeability of criminal acts; the vagueness of the standard which the landlord must meet; the economic consequences of the imposition of the duty; and conflict with the public policy allocating the duty of protecting citizens from criminal acts to the government rather than the private sector."

> "But the rationale of this very broad general rule falters when it is applied to the conditions of modern day urban apartment living, particularly in the circumstances of this case. The rationale of the general rule exonerating a third party from any duty to protect another from a criminal attack has no applicability to the landlord-tenant relationship in multiple dwelling houses. The landlord is no insurer of his tenants' safety, but he certainly is no bystander. And where, as here, the landlord has notice of repeated criminal assaults and robberies, has notice that these crimes occurred in the portion of the premises exclusively within his control, has every reason to expect like crimes to happen again, and has the exclusive power to take preventive action, it does not seem unfair to place upon the landlord a duty to take those steps which are within his power to minimize the predictable risk to his tenants."

*Kline* presents a different relationship and vastly different circumstances from that of the case at bar.

Every reason noted in the first paragraph of the quote from *Kline* is particularly relevant to this case and each strongly militates against the adoption of a rule requiring affirmative action of unknown type and extent by owners and operators of business premises. While it may not seem unfair in the light of public sentiment and social policy in Washington, D.C. to impose upon landlords the duty of protecting against criminal acts, in our opinion it is patently unfair and unjust to impose the vague duty of Section 344 Restatement of Torts (Second) on the shopkeepers and merchants of Tennessee, as the minority of this Court proposes, for the sudden criminal acts of unknown and unidentified persons.

Evidently the minority attempts to justify the "fairness" of the rule in a paragraph describing the modern phenomenon of community shopping centers. These so-called "cities within cities", it is implied, create enormous potential for profit and at the same time enormous potential for crime and

presumably the expected benefit justifies the requirement of special obligations, as suggested by Professor Prosser.

We are unable to find a factual basis in the allegations of the complaint from which these conclusions can justifiably be drawn nor do we embrace the social policy inherent therein as an acceptable basis for judicial rule making.

In *Taylor v. Centennial Bowl, Inc.,* 65 Cal.2d 114, 52 Cal.Rptr. 561, 416 P.2d 793 (1966), the Supreme Court of California approved Section 344 of the Restatement of Torts (Second) and held that the proprietor of a bowling alley was negligent in failing to protect plaintiff from a criminal assault on its parking lot. *Taylor* involves a special relationship and special circumstances that distinguish it from the instant case. The particular individual, one Walters, who assaulted plaintiff had been making indecent proposals to her over a period of several hours. These events occurred in and around the cocktail lounge operated by defendant as a part of the premises known as the Woodley Lewis Sportsmen Bowl, containing thirty-two (32) bowling lanes, a coffee shop, a billiard room and a nursery, with parking lots to the front and rear. Plaintiff reported the actions of Walters to defendant's bouncer. When she prepared to leave about 2:00 a. m. the bouncer told her that Walters was outside and to be careful but he did not escort her to her car. Upon reaching her car on defendant's premises, she was attacked and viciously slashed with a knife by Walters sustaining serious and permanent injuries.

In our opinion, *Taylor* provides no justification for the application of Section 344 Restatement of Torts (Second) to shopping center merchants, particularly where the actor is unknown and unidentifiable prior to the commission of the criminal act.

*O'Brien v. Colonial Village, Inc.,* 119 Ill. App.2d 105, 255 N.E.2d 205 (1970), is in our opinion, the only case that lends any support to the appellants position. It was decided by the Intermediate Appellate Court,

not the Supreme Court of Illinois. Because the complaint failed to allege facts sufficient to create a duty on the part of defendants to plaintiffs, the court was not called upon to state every element required to make out a cause of action for the criminal acts of third parties. In short, it was only necessary to point out that no notice to defendant of previous incidents or special circumstances having been alleged, no duty existed to anticipate danger. The case makes no pretense of stating the complete rule of law in Illinois upon which liability of shopkeepers in a shopping center for the criminal acts of third parties will be predicated.

In *Murray v. Osenton,* 126 So.2d 603 (Fla. 1961), an employee of a service station operator sued his employer for personal injuries sustained as a result of being shot during a robbery at night when employee was the lone attendant at the station. The gravamen of the complaint was that employer had knowledge of the unusual danger presented by the likelihood and foreseeability of robberies and burglaries, peculiar to service stations in Orlando, Florida, and that employer negligently failed to take reasonable measures to protect employee. The District Court of Appeals of Florida held that the complaint failed to state a cause of action; that while employer had a duty to provide a safe place for his employee to work, the allegations were insufficient to give rise to a duty to protect him from the assault of criminals.

In *McMillin v. Barton-Robison Convoy Company,* 182 Okl. 553, 78 P.2d 789 (Okl. 1938), plaintiff, as next of kin of a deceased employee of defendant, brought suit for the wrongful death of the employee. Plaintiff's decedent was killed during a robbery on the premises of the employer-defendant. Liability was sought to be predicated upon contentions that defendant was engaged in handling automobiles which were stolen from his premises from time-to-time prior to the killing, at the time of the killing and subsequent thereto; that the business was located in a high crime area wherein eighty

(80%) percent of the crime committed in the county occurred.

Responding to those contentions the Supreme Court of Oklahoma said:

"We are unable to see that an employer has a general duty to protect his employees from the assaults of criminals. We are likewise unable to see that there are any exceptional circumstances in this case which would give rise to such a duty. To so find would be tantamount to saying that the town of Picher is a condemned community. We would be saying, in legal effect, that those who live there and those who engage in business there are not exercising the prudence and judgment of ordinary people. To hold what the plaintiffs want us to hold would result in saying that every business man in the town of Picher is guilty of negligence toward those he employs and is answerable to them for their damages suffered as the result of the act of some criminal."

■ As heretofore pointed out in the instant case the allegation is made that criminal acts have been committed, "either on the premises or in the immediate area". We have found no case imposing any duty or liability arising from occurrences in the "area" or the "vicinity". Where liability has been imposed .it is clear that an essential ingredient is what Professor Prosser calls "premises liability". As relevant here premises liability is some mode of operation of, or condition upon the premises that lures, aids or abets the special danger. Conditions in the area are irrelevant.

Finally, we disagree that *Corbitt v. Ringley Crockett, Inc.,* 496 S.W.2d 914 (Tenn. App.1973), supports plaintiff's insistence that the complaint before us states a valid cause of action. The same observations made above with respect to *O'Brien v. Colonial Village* are applicable with equal force to *Corbitt.* In addition *Corbitt* deals with an entirely different relationship than that which exists between the parties to this lawsuit.

In *Corbitt,* plaintiff was assaulted in a restroom at the Civic Coliseum in Knoxville. The Court of Appeals announced the following rule in that case:

"We hold that if the owner is to be held liable for the sudden criminal acts of third persons there must be a showing that the owner was on notice in some manner of the imminent probability of the act. Otherwise, there can be no issue for jury determination . . . "

In subjecting the brief rule stated in *Corbitt* to analysis for guidance in this case the question arises whether the rule requires notice of the imminent probability of an act by the particular offender who commits the act, or would the occurrence of various criminal acts at unspecified times prior to the act in suit suffice? If the latter, how many criminal acts are necessary to invoke the duty to warn and how many are necessary to impose the duty to hire a private police force? Is the Court to determine the number, or is the jury to be permitted to speculate upon the appropriate number of criminal acts to give rise to the duty? Is it not also appropriate to consider the time element? After a lapse of six months, one year or two years without an incident or a criminal act, can a merchant disband his private police force?

■ In our opinion it is a mistake to equate the duty of shopkeepers with respect to criminal acts with the duty of shopkeepers with respect to careless acts. Section 344 of the Restatement of Torts (Second) places both acts in exactly the same category in comment f.

We are concerned in this case with the liability of the business establishments in Eastgate Shopping Center for the sudden criminal act of a temporarily or permanently depraved person, who according to the affirmative allegations contained in the complaint gave no notice by word, act, dress or deed prior to the commission of the attack that would have indicated to anyone an intention of purpose to commit an assault.

We are not called upon, in this case, to draft a rule applicable to all of the many types of business and entertainment and service establishments or of every premises liability, or special relationship situation wherein a duty of protection of invitees might be asserted, and we do not propose to do so.

■ In our opinion the appropriate rule applicable to this case is as follows: There is no duty upon the owners or operators of a shopping center, individually or collectively, or upon merchants and shopkeepers generally, whose mode of operation of their premises does not attract or provide a climate for crime, to guard against the criminal acts of a third party, unless they know or have reason to know that acts are occurring or about to occur on the premises that pose imminent probability of harm to an invitee; whereupon a duty of reasonable care to protect against such act arises.

### IV.

■ Assuming arguendo, that the complaint in this case states a cause of action upon which relief could be granted, we would dismiss the lawsuit for another reason. The facts alleged in paragraph five (5) of the complaint establish an efficient, intervening and unforeseeable cause for the injury sustained by Marie Cornpropst. The minds of reasonable men cannot differ but that the sudden act of Sloan, which could not have been prevented or deterred by the exercise of reasonable care on the part of the shopping center merchants, was the sole proximate legal cause of harm to Marie Cornpropst. *Lancaster v. Montesi,* 216 Tenn. 50, 390 S.W.2d 217 (1965).

We affirm the trial court. The costs are adjudged against plaintiffs.

COOPER, BROCK and HARBISON, JJ., concur.

HENRY, J., dissents.

HENRY, Justice (dissenting).

I respectfully dissent from the major conclusions reached by my colleagues.

The Chief Justice has skillfully articulated the issues in Section I of the majority opinion and has disposed of the procedural questions in precise and flawless phraseology. With that section I am in full accord.

The Eastgate Shopping Center consists of an aggregation of approximately thirty-seven tenant-merchants with a parking area consisting of 1600 unrestricted parking spaces. The occupants of this shopping center have banded themselves together in an association known as the Eastgate Shopping Center Association, designed to promote their common welfare and protect their common interest.

On the night of 18 October 1973, plaintiff, Marie Cornpropst, came as a customer to the shopping center and parked her automobile in one of the spaces in the parking area. After completing her purchases she returned to her automobile where she was brutally attacked by the defendant, Sloan, a third party having no connection with the remaining defendants.

The pertinent parts of the complaint are quoted verbatim in the majority opinion, but the very length of the quotation tends to obscure the basis of the cause of action.

Plaintiff, in substance, charged:

a. That by virtue of other crimes, assaults, and acts of violence on or in the immediate vicinity of the Eastgate Shopping Center, its parking area had become unsafe and particularly dangerous.

b. That the defendants knew or in the exercise of reasonable and proper care should have known that plaintiff-customer would be exposed to acts of violence and faced potential danger.

c. That defendants owed a duty to plaintiff-customer to take adequate

precautions to guard against the known dangers.

d. That no security guards were posted, no patrols were established, and no other precautions were taken to guard against this known danger.

e. That no warning of the potential danger was given to plaintiff-customer.

The majority holds that these derelictions, breaches of duty and violations of standards of due care are not actionable. I am in violent disagreement.

The modern phenomenon of merchandising and marketing through community shopping centers has opened a new vista into the concept of tort liability of the owners, occupiers or possessors of public business premises. In such centers, aptly called "cities within cities", virtually all the marketing demands of the general public can be met on a "one stop" basis. Central cities have suffered as a result of these decentralized mercantile conglomerations, and they have produced heretofore unknown legal problems. The primary incentive to the utilization of these shopping areas is the availability of adequate and free parking facilities, which the public, in general, is invited to use without let or hindrance, but always with the expectancy that the tradesmen in the market places will profit by such use. Having thus caused enormous congregations of potential and actual shoppers in relatively compact areas, certain duties devolve upon the invitors for the benefit and protection of the invitees. We have no Tennessee cases in point, and this area of the law has not fully developed in other jurisdictions; however, an emerging trend has been established.

We do not deal with an employer-employee relationship; with innkeepers and guests; with amusement park operators and their patrons; with landlord and tenant relationships; nor do we deal with public parking lots of the conventional variety, nor garages, nor any other relationship. Each of these situations presents different and differing rights and duties.

The trial judge, in sustaining the motion to dismiss, relied upon *Thomas v. General Electric Company*, 494 S.W.2d 493 (Tenn. 1973) as the controlling authority. Evidently he was prompted by the following language from *Thomas*:

> In order to sustain appellant's contention this Court would have to conclude that as a matter of law anyone providing a guarded parking lot assumes the burden of *insuring* the safety of any invitee using the lot. (Emphasis supplied). 494 S.W.2d at 495.

The majority opinion concedes that *Thomas* is not controlling.

I wish to make it crystal clear that I would *not* impose upon the defendant merchants the duty of an insurer—just the duty of reasonable care—a duty to take reasonable and commensurate precautions in the face of a known danger.

In *Corbitt v. Ringley-Crockett, Inc.*, 496 S.W.2d 914 (Tenn.App.1973), the Court applied a test of foreseeability, stating that

> Even though the assault be sudden, if the owner could reasonably anticipate such an assault under the facts and fails to attempt to prevent it, he may be held liable. 496 S.W.2d at 917.

The complaint brings plaintiff squarely within this foreseeability exception to the general rule of non-liability.

In *Corbitt* "such an occurrence as complained of had never before happened." The Court, on the facts of that case, concluded its opinion by saying:

> We hold that if the owner is to be held liable for the sudden criminal acts of third persons there must be *a showing that the owner was on notice in some manner of the imminent probability of the act.* Otherwise, there can be no issue for jury determination. (Emphasis supplied).

This case tends to be supportive of plaintiff's insistence that the complaint stated a valid cause of action.[1]

Again in *Taylor v. Centennial Bowl, Inc.*, 65 Cal.2d 114, 52 Cal.Rptr. 561, 416 P.2d 793 (1966) involving a parking lot injury, the Court recognized

. . . the duty to take affirmative action to control the wrongful acts of third persons which threaten invitees where the occupant has *reasonable cause to anticipate such acts* and the probability of injury resulting therefrom.  416 P.2d at 497.

The Court approved Section 344 of the Restatement of Torts (Second) *infra*, and held that the failure of a proprietor to secure the right of a patron to enter the parking lot without being attacked was a breach of duty.

Appellant also relies upon *O'Brien v. Colonial Village, Inc.*, 119 Ill.App.2d 105, 255 N.E.2d 205 (1970).  This was a suit against the owners and operators of a shopping center, and one of its tenants, by a patron who was assaulted, by a third party, in the parking area.  Factually it is on all fours with the case at bar.

Initially the complaint charged prior incidents of criminal activity on the premises known to defendants.  When defendants filed a motion for a bill of particulars, plaintiff was unable to support these allegations and the complaint was amended to delete them.  Citing another Illinois case the Court said:

(A) good complaint in a case similar to this must show not only danger of assault but that the defendant had notice of such danger and should reasonably have anticipated it.  255 N.E.2d at 207.

The Court held that the trial judge acted correctly in dismissing the complaint, saying:

We conclude that the common law duty of reasonable care owed to persons lawfully on premises cannot be extended to a duty to guard against the criminal acts of a third person, absent knowledge of previous incidents or special circumstances which would charge the owners with knowledge of the dangers and the duty to anticipate it.  Such circumstances are not alleged in the complaint, and it, therefore, failed to state a cause of action.

The present complaint meets the criteria established by *O'Brien*.

With utmost deference to my Brothers, the standard announced in the majority opinion affords virtually no protection to shopping center invitees, irrespective of the nature, character or extent of the known risk, and virtually immunizes the owner against liability for all except gross derelictions of duty.  In my view such a standard is not in the best interests of the consuming public.

My investigation into the law and my search for a reasonable standard has led me to Restatement (Second) of Torts, Sec. 344, which reads as follows:

Sec. 344.  Business Premises Open to Public: Acts of Third Persons or Animals.

A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to

(a) discover that such acts are being done or are likely to be done, or

(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

The Comments (b) make it clear that "third persons" include "other invitees or

---

1.  See also *Twin City Amusement Company v. Salater*, 372 S.W.2d 224 (Ark.1963), also involving an injury at a rock and roll concert, wherein the court, on a different factual situation, reversed a judgment for the injured plaintiff.

licensees upon the premises and also trespassers." They likewise make it clear, under reasonable care (d) that the possessor is not an insurer against the acts of third persons; but he is under a duty to exercise reasonable care to give them protection . . . A warning may be sufficient, however, the comment continues, there are:

> (M)any situations in which the possessor cannot reasonably assume that a warning will be sufficient. He is then required to exercise reasonable care to use such means of protection as are available, or to provide such means in advance because of the likelihood that third persons, or animals, may conduct themselves in a manner which will endanger the safety of the visitor.

As to the duty to police the premises, Comment f, specifies:

> Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.

I would adopt the rule of Restatement, as above set out.

I point out, however, that the standard of care is not fixed, rigid or inflexible and should, perforce of necessity be modified, adjusted and adopted to meet a standard of fairness and justice under the facts and circumstances of each particular case. It is evident that the degree of care must be commensurate with, and bear some relation to, the risk involved. It is evident that no proprietor is required to be an insurer. It is evident that any standard must be reasonably applied to the end that its application not work an undue hardship on any business activity. It is evident that no standard should require anything beyond protection against reasonable estimates of probabilities. It is evident that a proprietor is not required to protect his invitees against remote or conjectural possibilities nor to "waste his anxiety upon events that are barely possible", and lastly it is evident that no proprietor has any responsibility for affirmative action against acts or occurrences on sidewalks or public ways adjacent to his business house, absent exceptional considerations. In summary, the guidelines should be given a reasonable, realistic and fair interpretation.

I would hold that, when tested by these standards and guidelines, and the rules governing pleading in Tennessee, the complaint states a good and valid cause of action or a claim upon which relief may be granted.