IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 16, 2005 Session

## DAVID HELTON, ET AL. v. GLENN ENTERPRISES, INC., DBA LINMAR HOSPITALITY

**Appeal from the Circuit Court for Knox County**
**No. 3-784-03      Wheeler A. Rosenbalm, Judge**

---

**No. E2005-00103-COA-R3-CV - FILED JANUARY 26, 2006**

---

David Helton and his wife, Charlotte Helton, brought suit against Glenn Enterprises, Inc., dba Linmar Hospitality, the operator[1] of a Fairfield Inn in Knox County, for compensatory damages arising out of the theft of their drag racing vehicle and other personal property losses, all of which occurred while the plaintiffs were guests at the defendant's motel. At the conclusion of a jury trial, the court directed a verdict for the defendant, holding that there was no liability shown by the proof. This holding was predicated upon the fact that the parking lot where the plaintiffs parked their truck and trailer,[2] while close to the defendant's motel, was not actually on the defendant's property. The plaintiffs appeal, arguing that the duty established by the Supreme Court in the case of ***McClung v. Delta Square Ltd. P'ship***, 937 S.W.2d 891 (Tenn. 1996) should apply to the facts of this case. They contend that they made out a question for the jury on the ***McClung*** issue as well as on the issue of liability under the Tennessee Consumer Protection Act ("the TCPA"). We vacate the trial court's judgment on these two issues and remand for a new trial.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY and SHARON G. LEE, JJ., joined.

Stephen A. Marcum, Huntsville, Tennessee, for the appellants, David Helton and wife, Charlotte Helton.

Jay Arthur Garrison, Knoxville, Tennessee, for the appellee, Glenn Enterprises, Inc. dba Linmar Hospitality.

---

[1] The defendant manages and operates the motel for its owner. As we read ***McClung***, the holding in that case would apply to an entity that operates the property owner's business.

[2] The drag racing car and the other personal property were located in the trailer.

**OPINION**

**I.**

The plaintiffs, who are residents of Kentucky, are "weekend" drag racing enthusiasts. On July 25, 2003, they, along with their two small children, stopped at a Fairfield Inn near the Strawberry Plains exit off Interstate 40 in Knox County. The family traveled to the motel in a 1988 Chevrolet "dually" truck, which was towing a 36-foot gooseneck trailer. The trailer contained a drag racing car, a golf cart, racing equipment, and other personal property owned by the plaintiffs. The plaintiffs refer to the truck and trailer as "the rig," as will we.

Upon arriving at the motel, the plaintiffs observed that the parking area immediately adjacent to the motel was "pretty full," which was not unusual for that time of year. Because the motel did not have designated parking spaces for oversized rigs such as their rig (which was approximately 40 to 50 feet long), the plaintiffs parked in a paved parking area in front of the motel but separated from the parking adjacent to the motel's entrance by a curbed grassy median. From the photographs in the record, the median appears to be approximately two car-lengths in depth. The area in question was paved and lined for parking spaces. The plaintiffs observed that other guests of the motel – including guests who arrived in a large bus – had parked in that lot and were entering the motel from that lot with their luggage. There were no signs posted to indicate that the lot was not owned by the motel or to advise guests against parking there. In fact, the motel's manager was aware that guests commonly parked in that lot, particularly due to the lot's relatively-close proximity to the front door of the motel.

Knowing that guests preferred the convenience of the lot where the plaintiffs parked their rig, the motel's manager instructed the desk clerks that they were not to discourage guests from using the lot, unless a guest specifically inquired about parking there. In June, 2003, the real owner of the lot had complained to the manager about guests of the motel using his premises for parking. As a result of this complaint, the manager, once again, instructed the desk clerks to tell guests *not* to park in the lot, but *only* if the guests specifically asked. In addition, desk clerks were instructed to inform guests about the lack of motel security, but *only* if the guests specifically asked.

When the plaintiffs checked into the motel on July 25, 2003, Mr. Helton approached the desk clerk on duty, pointed to his rig in the parking lot (which was visible from the front desk), and asked the desk clerk "if [his] stuff [would] be all right there where [he] parked it." According to Mr. Helton, the desk clerk leaned over the front desk, looked at the plaintiffs' rig and responded that "it should be fine – or something similar [to that statement]."[3] Despite Mr. Helton's specific inquiry and the manager's instruction as to how the clerks were to respond to such an inquiry, the clerk did not inform the plaintiffs that they should not park in that lot, or that the motel did not own that lot, nor did the clerk give the plaintiffs anything in writing to advise them against parking in that lot.

---

[3]At the time of trial, the desk clerk was deceased and her testimony had not been preserved prior to her death.

In addition, the clerk said nothing about the recent vehicle thefts and burglaries that had occurred on the premises of the motel and in the area around the motel's property. Mr. Helton testified that he took into account the clerk's response when he decided to leave his rig in the lot and stated that, had he been told about the vehicle thefts, he would have driven the rig home and returned to the motel in the family van because the rig was "just too much to risk."

The following morning, the plaintiffs discovered that their rig had been stolen. Mr. Helton asked the desk clerk on duty – who was someone other than the person on duty when the Heltons checked in the previous evening – if the motel had experienced any prior thefts, and the clerk responded that it had not. When Mr. Helton asked to speak to the manager, the same desk clerk informed him that the manager did not have time to talk to him, as he was busy preparing for an inspection by Marriott. When Mr. Helton's father arrived later in the morning to drive the plaintiffs and their children back to Kentucky, the father asked the manager whether the motel had experienced any problems with thefts, and the manager responded that they had never had anything stolen. The manager then proceeded to tell Mr. Helton's father that the motel often housed guests participating in car shows in Sevier County and that the motel parking lot would be full of "show cars," none of which had ever been discovered missing. Sometime later, when the plaintiffs were communicating with the Knoxville Police Department ("KPD") about the theft, the plaintiffs learned that there had been a number of vehicle thefts and burglaries at the motel. The record reflects that KPD had received reports of 32 separate incidents at the motel from January 11, 2001, through July 26, 2003, the date on which the plaintiffs' rig was stolen. These incidents included 17 stolen vehicles, including the plaintiffs' rig; 11 vehicle burglaries; 2 attempted vehicle thefts; 1 theft of motor vehicle parts; and 1 armed robbery. In fact, one vehicle had been reported stolen from the motel's premises just ten days prior to the theft of the plaintiffs' rig.

While the desk clerk on duty the morning after the theft had told Mr. Helton that he was unaware of any prior thefts on the motel's property, he later admitted at trial – once faced with copies of vehicle theft reports personally signed by him – that the motel had experienced prior thefts and burglaries. Moreover, the motel's manager was also aware of the crime problem at the motel. He admitted at trial that, prior to the July 26, 2003, theft of the plaintiffs' rig, he was aware of reports of people behaving suspiciously in the motel's parking lot; of the prior vehicle thefts and burglaries at his motel; of similar thefts from other area businesses; and of a meeting that area business owners had conducted to discuss the theft problem. The manager asked KPD to patrol the motel's parking lot, but was advised that KPD could not make any promises about their ability to make regular patrols. The manager then requested that KPD conduct a "sting" operation at the motel, using a "dummy" vehicle as bait in an effort to catch the thieves, but KPD declined to do so.

In spite of the manager's knowledge of the crimes on the motel's property and his request for assistance from KPD, the manager chose not to increase motel security. The motel had no security guards or outside cameras, and the manager never instructed the staff to patrol the parking lot. While the manager discussed with his supervisor, Tim Knipp, the possibility of increased security, they decided that the number of thefts and burglaries at the motel was insufficient to justify the additional expense.

Mr. Knipp, who is vice president of operations for the defendant, testified that the motel was concerned about the incidents of criminal activity. He stated that the number of thefts at the motel was unacceptable. However, he went on to state that the number of criminal incidents was not sufficient to warrant a meeting with a security consultant. Both the manager and Mr. Knipp testified that guests at the motel were not told of the ongoing crime in the area out of a concern that it would hurt business and affect the motel's bottom line.

At trial, the plaintiffs introduced the testimony of Tim Twohig, who is employed with a Knoxville security firm. Mr. Twohig testified that in July, 2003, the motel could have hired a 24-hour-a-day security guard for $13.28 per hour. Mr. Knipp admitted that the motel could have hired a staff person or desk clerk to patrol the parking lot for approximately $7.00 per hour. The manager also admitted that the motel's employees simply could have informed guests at check-in of the ongoing crime problem. In addition, the manager conceded that, at very little cost, the motel could have provided guests with flyers notifying them of the thefts and advising them as to where they should park.

The plaintiffs' truck and trailer were later recovered in Cocke County at a "chop shop." Both had been damaged. The race car and the other personal property were never recovered.

The plaintiffs filed a complaint against the defendant in the instant case on December 15, 2003, alleging that it was liable to the plaintiffs for the theft of their rig. The plaintiffs' theories of recovery included negligence; gross negligence; negligent and/or intentional and/or fraudulent misrepresentation; concealment; and violation of the Tennessee Consumer Protection Act ("the TCPA"). The motel answered, denying any culpability.

The case was tried before a jury in December, 2004. At the close of the plaintiffs' proof, the defendant moved for a directed verdict, which motion was denied. At the conclusion of all the proof, the defendant renewed its motion. This time, the trial court granted the defendant's motion and dismissed the plaintiffs' case. The trial court entered its final judgment on December 14, 2004. From this judgment, the plaintiffs appeal.

II.

We review a trial court's decision on a motion for directed verdict *de novo*, "applying the same standards as the trial court." **Biscan v. Brown**, 160 S.W.3d 462, 470 (Tenn. 2005) (citing **Gaston v. Tenn. Farmers Mut. Ins. Co.**, 120 S.W.3d 815, 819 (Tenn. 2003)). A directed verdict is appropriate "only when the evidence in the case is susceptible to but one conclusion." **Childress v. Currie**, 74 S.W.3d 324, 328 (Tenn. 2002) (citing **Eaton v. McLain**, 891 S.W.2d 587, 590 (Tenn. 1994)). We must "take the strongest legitimate view of the evidence favoring the opponent of the motion," allowing "all reasonable inferences in favor of the opponent of the motion," and disregarding "all evidence contrary to the opponent's position." **Id.** After assessing the evidence in this fashion, we will affirm the directed verdict only upon a determination "that reasonable minds could not differ as to the conclusions to be drawn from the evidence." **Eaton**, 891 S.W.2d at 590.

To the extent that the trial court's judgment is based upon a conclusion of law, our *de novo* review is undertaken with no presumption of correctness as to the trial court's legal conclusions. ***S. Constructors, Inc. v. Loudon Co. Bd. of Educ.***, 58 S.W.3d 706, 710 (Tenn. 2001).

## III.

As previously indicated, the plaintiffs' complaint recites numerous theories of recovery. However, the plaintiffs' brief on appeal only addresses the theories of negligence under the rubric of ***McClung*** and culpability under the TCPA. Therefore, the issue of whether the trial court erred in dismissing the plaintiffs' suit under the other theories of recovery is treated by us as being waived.[4]

## IV.

## A.

The plaintiffs' theory regarding the negligence of the defendant, as previously stated, is bottomed on the holding in the case of ***McClung v. Delta Square Ltd. P'ship***, 937 S.W.2d 891 (Tenn. 1996). In ***McClung***, the Supreme Court granted permission to appeal "to review the standard for determining business owner liability for injuries occurring *on the business premises* and caused by the criminal acts of third parties." ***Id***. at 893 (emphasis added). In that case, the plaintiff's wife went to a shopping center in Memphis to shop at Wal-Mart, the center's "anchor tenant." ***Id***. at 893-94. As she was returning to her car in the center's parking lot, she was abducted at gunpoint by a fugitive from Chattanooga, who later raped her and forced her into the trunk of her car where she suffocated. ***Id***.

The plaintiff in ***McClung*** sued Wal-Mart and the owner of the shopping center. ***Id.*** at 894. He alleged that the defendants were negligent "in failing to provide security measures for the parking lot and that their negligence was the proximate cause of [his wife's] death." ***Id***. When confronted with the defendant's motion for summary judgment, the plaintiff relied, in part, upon "records from the Memphis Police Department, which indicated that from May, 1989 through September, 1990, when plaintiff's wife was abducted, approximately 164 criminal incidents had occurred on or near defendants' parking lot." ***Id***. at 903. The trial court, relying upon the precedent of ***Cornpropst v. Sloan***, 528 S.W.2d 188 (Tenn. 1975), reluctantly granted the defendants summary judgment. ***Id***.

---

[4]In ***Hawkins v. Hart***, 86 S.W.3d 522 (Tenn. Ct. App. 2001), we stated that

> [i]n order for an issue to be considered on appeal, a party must, in his [or her] brief, develop the theories or contain authority to support the averred position as required by [Tenn. R. App. P.] 27(a). "Where a party makes no legal argument and cites no authority in support of a position, such issue is deemed to be waived and will not be considered on appeal."

*Id*. at 531 (quoting ***Branum v. Akins***, 978 S.W.2d 554, 557 n.2 (Tenn. Ct. App. 1998)).

at 894. The Court of Appeals affirmed. *Id*.

The Supreme Court reversed the trial court, stating that "we must disavow the observation made in *Cornpropst* that 'conditions in the area [of the defendant's business] are irrelevant' in assessing the foreseeability of a criminal act." *Id*. at 899 (quoting *Cornpropst*, 528 S.W.2d at 197) (bracketing in *McClung* opinion). The High Court held that it was "join[ing] those courts which generally impose a duty upon businesses to take reasonable measures to protect their customers from foreseeable criminal attacks." *Id*.

In addressing the nature and scope of the duty of owners and occupiers of business premises to customers, the Supreme Court stated as follows:

> A business ordinarily has no duty to protect customers from the criminal acts of third parties which occur *on its premises*. The business is not to be regarded as the insurer of the safety of its customers, and it has no absolute duty to implement security measures for the protection of its customers. However, a duty to take reasonable steps to protect customers arises if the business knows, or has reason to know, either from what has been or should have been observed or from past experience, that criminal acts against its customers *on its premises* are reasonably foreseeable, either generally or at some particular time.
>
> In determining the duty that exists, the foreseeability of harm and the gravity of harm must be balanced against the commensurate burden imposed on the business to protect against that harm. In cases in which there is a high degree of foreseeability of harm and the probable harm is great, the burden imposed upon defendant may be substantial. Alternatively, in cases in which a lesser degree of foreseeability is present or the potential harm is slight, less onerous burdens may be imposed. By way of illustration, using surveillance cameras, posting signs, installing improved lighting or fencing, or removing or trimming shrubbery might, in some instances, be cost effective and yet greatly reduce the risk to customers. In short, "the degree of foreseeability needed to establish a duty decreases in proportion to the magnitude of the foreseeable harm" and the burden upon defendant to engage in alternative conduct. "As the gravity of the possible harm increases, the apparent likelihood of its occurrence need be correspondingly less to generate a duty of precaution." The degree of foreseeability needed to establish a duty of reasonable care is, therefore, determined by considering both the magnitude of the burden to defendant in complying with the duty and magnitude of the foreseeable harm.

As a practical matter, the requisite degree of foreseeability essential to establish a duty to protect against criminal acts will almost always require that prior instances of crime have occurred on or in the immediate vicinity of defendant's premises. Courts must consider the location, nature, and extent of previous criminal activities and their similarity, proximity, or other relationship to the crime giving rise to the cause of action. To hold otherwise would impose an undue burden upon merchants.

The balancing approach we adopt appropriately addresses both the economic concerns of businesses and the safety concerns of customers who are harmed due to the negligence of one seeking their business. . . . The criminal who intends to strike in defendant's parking lot will not enter defendant's store to announce his intentions and thereby provide defendant actual notice of the impending attack. In short, this new rule provides the fairest and most equitable results. It creates a duty in limited circumstances, giving merchants neither absolute immunity nor imposing absolute liability. It recognizes the national trend that businesses must justifiably expect to share in the cost of crime attracted to the business. It encourages a reasonable response to the crime phenomenon without making unreasonable demands.

*Id*. at 902 (internal citations and footnote omitted) (emphasis added).

B.

The parties differ sharply as to whether the holding in *McClung* applies to the facts of this case. We agree with the defendant that there is a major factual difference between *McClung* and the instant case. In *McClung*, the property upon which the criminal act occurred was owned by the shopping center defendant and made available by it to the customers of the defendant Wal-Mart; by contrast, in the instant case, the theft of the plaintiffs' property took place on real estate not owned by the defendant or on property that was the site of a business operated by it. The holding in *McClung*, *when read in the context of the facts of that case*, applies to "injuries occurring *on the business premises*." *Id*. at 893 (emphasis added).

The plaintiffs strenuously argue that the holding in *McClung* should not be limited to criminal activity on one's property but rather should be expanded to include activity that occurs on property that a defendant leads a customer to reasonably believe is owned by or under the control of the defendant. We agree with the plaintiffs on this point.

In *Bradshaw v. Daniel*, 854 S.W.2d 865 (Tenn. 1993), the Supreme Court stated that the

-7-

> imposition of a legal duty reflects society's contemporary policies and social requirements concerning the right of individuals and the general public to be protected from another's act or conduct.
>
> *   *   *
>
> Indeed, it has been stated that "'duty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection."

*Id*. at 870 (quoting W. Keeton, *Prosser and Keeton on the Law of Torts* § 53 at 358 (5th ed. 1984)). In *McClung*, the Supreme Court addressed the duty established in that case:

> [The new rule] creates a duty in limited circumstances, giving merchants neither absolute immunity nor imposing absolute liability. It recognizes the national trend that businesses must justifiably expect to share in the cost of *crime attracted to the business*.

*McClung*, 937 S.W.2d at 902 (emphasis added).

We believe that the underlying justification for the *McClung* rule applies with equal force to criminal activity on property that the defendant causes a customer to reasonably believe is owned by the defendant or under the defendant's control. In both cases, as far as the customer is concerned, the property is one for which the defendant is responsible. If a plaintiff believes – and reasonably so because of the conduct of the defendant – that the defendant is responsible with respect to certain property, the customer can also reasonably believe that the defendant has the ability to take action with respect to that property. Accordingly, we believe it is a reasonable and natural expansion of the duty recognized in *McClung* to hold that if a defendant, by word or conduct, leads a customer of the defendant to reasonably believe that the defendant is the owner of property or otherwise responsible for the use of the property, the defendant is subject to the duty expounded upon in *McClung*, assuming the balancing test set forth in *McClung* is resolved in the plaintiff's favor. We so hold.

C.

In the case at bar, a jury could reasonably find – by the tenor of Mr. Helton's question to the desk clerk – that he, Mr. Helton, believed that the desk clerk, because of his position at the motel, would be able to tell him if the motel objected to his parking in the subject lot and if his "stuff [would] be all right." A jury could also conclude that Mr. Helton's question could reasonably be interpreted as inquiring whether his rig would be safe there and/or whether it was a place where the motel *permitted* patrons to park their vehicles. A jury could also reasonably conclude that the desk clerk's answer could be reasonably interpreted by Mr. Helton as an affirmative answer to these inquiries. Hence, a jury could reasonably conclude that the defendant (through the actions of the

desk clerk), by word and conduct, affirmatively induced Mr. Helton to reasonably believe that the motel owned the property or otherwise considered it a part of the premises of the motel or was otherwise responsible for it.

The conversation between Mr. Helton and the desk clerk at the time the Heltons registered must be viewed in the context of the physical layout of the motel and the surrounding parking areas. At the front entrance to the motel, there is a portico. The portico is located perpendicular to the length of the motel. When the plaintiffs checked in, the desk clerk was behind the registration counter which was just inside the front entrance. There are lined parking spaces on either side of the portico. These lined spaces are generally designed for vehicles facing the motel and for vehicles facing away from the motel. The facing-toward spaces and facing-away spaces are separated by the driveway running the length of the motel and through the portico.

When one exits the main entrance of the motel, he or she is facing a long, curbed grassy median running parallel with the driveway and the motel. From the photographs, it appears that the median is approximately two-car lengths in depth. On the other side of the median is pavement with lined parking spaces.[5] This is where the plaintiff parked his rig. This area is some 50 to 60 yards from the front desk. As previously noted, when Mr. Helton made his inquiry of the desk clerk, the clerk was able to lean over the counter and observe the plaintiffs' rig in front of her. It should also be noted that the plaintiff observed other vehicles – including a bus – in the subject parking area. He saw passengers from the bus exit the vehicle and carry luggage into the motel.

The Supreme Court in *McClung* noted that "the question of duty and of whether defendants have breached that duty by taking or not taking certain actions is one for the jury to determine based upon proof presented at trial." *McClung*, 937 S.W.2d at 904. In the instant case, there is evidence, which, if accredited, could lead a jury to reasonably conclude that "the foreseeability of harm and the gravity of harm" when "balanced against the commensurate burden imposed on the business to protect against that harm" would militate in favor of a finding of a duty. *Id*. at 902. There is also evidence from which a jury could reasonably conclude that the defendant breached that duty and that the breach was the cause in fact and legal cause of the plaintiffs' losses. Accordingly, we conclude that the trial court erred in directing a verdict for the defendant as to the plaintiffs' negligence claim under *McClung*.

D.

We next address whether the trial court erred in directing a verdict with respect to the plaintiffs' cause of action under the TCPA. Their basic claim under the Act was that the defendant's failure to disclose certain information, *e.g.,* its lack of ownership of the adjacent parking area, the fact that the real owner did not want guests of the motel parking on his property, and the prevalence

---

[5]This lined parking area apparently was once parking for a building that was completely leveled at some time before the incident involved in this case.

of criminal activity, including motor vehicle theft, on and near the defendant's motel, constituted an actionable "unfair or deceptive act."

After determining that the *McClung* duty did not extend to the facts before it, the trial court stated the following with respect to the plaintiffs' TCPA claim:

> No sale of goods were involved here, and if there's any implication of the Tennessee Consumer Protection Act at all, it must be under the theory that the defendant was selling a service to the plaintiff. An issue I do not believe we have to decide today but an issue about which I think there is, in my mind, serious doubt about whether this was a sale of service as contemplated by the legislature in adopting the Tennessee Consumer Protection Act.
>
> But I think the important conclusion is that if there was no duty to disclose these prior criminal incidents or the level of criminal activity in the community at or about the defendant's property, then there could be no unfair or deceptive act or practice for failure to disclose. The defendant could hardly be charged with being unfair or deceptive for failing to do something it was not otherwise bound by law to do.

The TCPA authorizes:

> [a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an *unfair or deceptive act or practice* declared to be unlawful by this part, [to] bring an action individually to recover actual damages.

Tenn. Code Ann. § 47-18-109(a)(1) (2001) (emphasis added). Though the Act does not define the terms "unfair" and "deceptive," it enumerates a number of specific "unfair or deceptive acts or practices [which] affect[] the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104(b)(1)-(40) (Supp. 2005). Included within this list is the "[e]ngaging in any other act or practice which is deceptive to the consumer or to any other person." Tenn. Code Ann. § 47-18-104(b)(27). The plaintiffs base their cause of action under the TCPA on this provision and its broad language.

The TCPA is to be "liberally construed" to "protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Tenn. Code Ann. § 47-18-102(2) (2001); *see Ganzevoort v. Russell*, 949 S.W.2d 293, 298 (Tenn. 1997). The term "consumer" is defined in the Act. "'Consumer' means any natural person who seeks or acquires by purchase, rent, lease, assignment, award by chance, or other disposition, any goods, *services*, or property, tangible or intangible, real, personal or mixed, and any

-10-

other article, commodity, or thing of value wherever situated . . . ." Tenn. Code Ann. § 47-18-103(2) (2001) (emphasis added). The terms "trade" or "commerce" are also defined, in part, as "offering for sale, lease or rental, or distribution of any goods, *services*, or property, tangible or intangible, real, personal, or mixed, and other articles, commodities, or things of value wherever situated[.]" Tenn. Code Ann. § 47-18-103(11) (emphasis added). Given the required liberal construction and the stated purpose behind the TCPA, we hold that the business transaction in this case, *i.e.,* the furnishing of hotel *services* for a fee, is covered by the Act.

"[W]hether a specific representation in a particular case is 'unfair' or 'deceptive' is a question of fact." ***Tucker v. Sierra Builders***, No. M2003-02372-COA-R3-CV, 2005 WL 1021675, at *4 (Tenn. Ct. App. M.S., filed April 29, 2005), *perm. app. denied*, October 24, 2005 (citation omitted). In the instant case, we hold that a jury could reasonably find that the plaintiff posed the aforementioned question (*i.e.,* "will my stuff be all right there where I parked it") to the desk clerk because he was concerned with the security of the area in which the rig was parked and because he believed that the defendant was the owner of the subject parking area or otherwise responsible for the area in question. A jury could also reasonably find that the desk clerk's response led the plaintiff to reasonably believe that the desk clerk had some basis of knowledge for telling him that it would be all right to park the rig in the adjacent lot. A jury could also reasonably conclude, based upon the desk clerk's response, that the plaintiffs reasonably believed that the defendant owned the adjacent lot or was responsible for it and that the clerk, acting for the motel, did not know of any reason why it would not be appropriate or safe to park there. If a jury were to find these facts, it could then reasonably find that the conduct of the desk clerk, as an employee of the motel, constituted "any other act or practice which [was] deceptive to the consumer or to any other person." *See **Smith v. Scott Lewis Chevrolet, Inc***., 843 S.W.2d 9, 12-13 (Tenn. Ct. App. 1992) (holding that even negligent conduct can constitute a deceptive act or practice under the Act). Accordingly, a directed verdict was not appropriate on the plaintiffs' TCPA claim.

V.

The judgment of the trial court directing a verdict for the defendant/appellee and dismissing the complaint on the theories based upon negligence and the TCPA are hereby vacated and this case is remanded to the trial court for a new trial. Costs on appeal are taxed to the appellee, Glenn Enterprises, Inc., dba Linmar Hospitality.

_____
CHARLES D. SUSANO, JR., JUDGE

-11-